*Alison Assanah-Carroll v. Law Offices of Edward J. Maher, P.C., et al.*, Misc. No. 11, September Term, 2021, Opinion by Booth, J.


**LANDLORD AND TENANT—LOCAL LICENSING ORDINANCE—FAILURE TO LICENSE PROPERTY—TENANT'S ABILITY TO BRING PRIVATE RIGHT OF ACTION UNDER THE MARYLAND CONSUMER PROTECTION ACT ("MCPA") TO OBTAIN RESTITUTION OF RENT BASED UPON LACK OF LICENSURE**

Article 13, § 5-4(a)(2) of the Baltimore City Code, which prohibits a landlord from charging, accepting, retaining, or seeking to collect rent for a rental property unless the property is properly licensed, does not provide Baltimore City tenants with a judicial remedy enabling City tenants to seek restitution of rent under the Maryland Consumer Protection Act ("MCPA"). A tenant may only maintain a private action under the MCPA for deceptive trade practices arising from renting an unlicensed dwelling if the tenant can prove that the unlicensed condition caused them to suffer an "actual injury or loss."

**LANDLORD AND TENANT—LOCAL LICENSING ORDINANCE—FAILURE TO LICENSE PROPERTY—LANDLORD'S ABILITY TO COLLECT UNPAID RENT THAT IS DUE AND OWING DURING THE UNLICENSED PERIOD**

In *McDaniel v. Baranowski*, 419 Md. 560 (2011), this Court applied common law principles to preclude an unlicensed landlord from utilizing the summary ejectment proceeding to enforce his contractual right to collect rent during a period when the landlord did not have a license to engage in rental activity. We determine that there is no reason to draw a distinction between an unlicensed landlord who is currently attempting to collect rent that is attributable to the unlicensed period on the one hand, and a landlord who *later* obtains a license and files a summary ejectment proceeding to collect rent attributable to the same unlicensed period. Based upon the Court's authority to apply the common law principles expressed in the Restatement (Second) of Contracts § 181 (1981), the Court holds as follows:

> Where a municipality or county enacts a rental license law which conditions the performance of a residential lease upon the issuance of a rental license, and a landlord fails to possess a valid license for a period of the tenant's occupancy, a landlord may not utilize the courts, whether through a common law breach of contract action, or a statutory action arising under Title 8 of the Maryland Code's Real Property Article to recover unpaid rent that is attributable to the unlicensed period. This prohibition shall not apply where the landlord can demonstrate that the wrongful actions of the tenant caused the licensing authority to suspend, revoke, or refuse to grant or renew the rental license.

**LANDLORD AND TENANT—LOCAL LICENSING ORDINANCE—FAILURE TO LICENSE PROPERTY—TENANT'S ABILITY TO BRING PRIVATE RIGHT OF ACTION UNDER THE MARYLAND CONSUMER PROTECTION ACT ("MCPA") OR THE MARYLAND CONSUMER DEBT COLLECTION ACT ("MCDCA") FOR DEBT COLLECTION ACTIVITY ASSOCIATED WITH UNPAID RENT**

Given our holding that a landlord may not engage in debt collection activities or pursue claims against a tenant who has failed to pay rent attributable to a period when the landlord was unlicensed, a tenant may have a right of action under the MCDCA and the MCPA where the landlord engages in such activity, and the tenant can establish that the unlawful conduct caused damages.

United States District Court
for the District of Maryland
Case No.: 20-02376-CCB
Argued: March 4, 2022

IN THE COURT OF APPEALS

OF MARYLAND

Misc. No. 11

September Term, 2021

ALISON ASSANAH-CARROLL

v.

LAW OFFICES OF
EDWARD J. MAHER, P.C., et al.

*Getty, C.J.,
Watts,
Hotten,
Booth,
Biran,
Gould,
McDonald, Robert N.
(Senior Judge, Specially Assigned),

JJ.

Opinion by Booth, J.
Watts, J., concurs and dissents.
Getty, C.J. and Gould, J., concur and dissent.

Filed: July 28, 2022

*Getty, C.J., now a Senior Judge, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to Md. Const., Art. IV, § 3A, he also participated in the decision and adoption of this opinion.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

Under the Baltimore City Code, a landlord is required to have a rental license to provide residential rental housing. This matter comes before the Court pursuant to two questions of law certified[1] by the United States District Court for the District of Maryland ("federal district court") regarding a tenant's right to recoup rent voluntarily paid by a tenant, as well as a landlord's right to collect unpaid rent, which is attributable to the period in which the landlord was not licensed.

The federal district court has certified the following questions to this Court, which we have slightly rephrased as follows:[2]

---

[1] Under the Maryland Uniform Certification of Questions of Law Act, Maryland Code, Courts & Judicial Proceedings Article ("CJ"), § 12-601 *et seq.* (1996, 2020 Repl. Vol.), this Court has the power to "answer a question of law certified to it by a court of the United States or by an appellate court of another state or of a tribe, if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State." CJ § 12-603.

[2] We have slightly rephrased the questions pursuant to our authority under CJ § 12-604. The questions presented to this Court in the certification order are:

1. Can a tenant who paid rent to a landlord in Baltimore City who lacked a license pursuant to the Baltimore City Code, Art. 13 § 5-4 maintain a lawsuit under either the Maryland Consumer Debt Collection Act (the "MCDCA") or the Maryland Consumer Protection Act (the "MCPA") to recover the rent paid without a showing of any damages separate from the rental payment itself?

2. Does a currently licensed landlord violate either the MCDCA or the MCPA by collecting rent from a tenant or pursuing ejectment actions against a tenant who has failed to pay rent during a prior period when the landlord, or a prior landlord, was not licensed under Baltimore City Code, Art. 13 § 5-4, where the tenant does not allege any damages separate from the rental payment itself?

1. Can a tenant who voluntarily paid rent to a landlord who lacked a rental license pursuant to the Baltimore City Code, Art. 13 § 5-4 maintain a private action under either the Maryland Consumer Debt Collection Act (the "MCDCA") or the Maryland Consumer Protection Act (the "MCPA") to recover restitution of rent where the tenant has not alleged that the lack of licensure caused her any actual injury or loss?

2. Does a currently licensed landlord violate either the MCDCA or the MCPA by engaging in debt collection activity or pursuing ejectment actions against a tenant who has failed to pay rent that is attributable to the period when the landlord was not licensed under Baltimore City Code, Art. 13 § 5-4, where the tenant does not allege any damages separate from the rent payment itself?

The answer to question 1 is "no." As set forth more fully herein, a tenant who voluntarily paid rent to a landlord who lacked a rental license may not bring a private action under the MCPA or the MCDCA to recover restitution of rent based upon the landlord's lack of licensure. Our case law firmly establishes that a tenant may only maintain a private action under the MCPA for deceptive trade practices arising from renting an unlicensed apartment if the tenant can prove that the unlicensed condition caused the tenant to suffer an "actual injury or loss." The Baltimore City Council, in enacting Bill 18-0185, which added § 5-4(a)(2) to the Baltimore City Code, did not intend to create a judicial remedy enabling City tenants to seek restitution of rent as part of a private action filed under the MCPA. Even if the City Council had intended to create such a remedy, the City Council lacks the authority to adopt a local law that modifies the remedies established by the MCPA—a state statute that provides uniform remedies to consumers on a state-wide basis who are subject to unfair, abusive, or deceptive trade practices.

With respect to question 2, we answer "yes." Consistent with this Court's authority to apply the common law, we hold that where a municipality or county enacts a rental

2

license law, which conditions the performance of a residential lease upon the issuance of a rental license, a landlord may not file an action against a tenant to recover unpaid rent that is attributable to the period when the property was not licensed. Accordingly, where a landlord attempts to collect unpaid rent from a tenant during a period when the landlord lacked a license to engage in such activity, a tenant may have a claim under the MCDCA and the MCPA to the extent that the landlord's unlawful collection activity caused the tenant to suffer damages, including rent payments made in response to the landlord's attempts to collect the unpaid rent.

# I

## Background

Under the Maryland Uniform Certification of Questions of Law Act, § 12-601, *et seq.*, the court certifying the question shall issue a certification order containing "(1) [t]he question of law to be answered; [and] (2) [t]he facts relevant to the question, showing fully the nature of the controversy out of which the question arose[.]" CJ § 12-606(a). In responding to a certification from another court, this Court accepts the facts provided by the certifying court. *See, e.g.*, *Price v. Murdy*, 462 Md. 145, 147 (2018). We resolve only issues of Maryland law, not questions of fact. *Parler & Wobber v. Miles & Stockbridge*, 359 Md. 671, 681 (2000).

### A. Procedural Posture of the Case Pending in the Federal District Court

Appellant Alison Assanah-Carroll ("Assanah-Carroll") is a tenant in an apartment building located at 2601 Madison Avenue in Baltimore (the "property"), which is owned and operated by the Appellees E.T.G. Associates '94 LP and Roizman Development, Inc.

3

For ease of reference, we will refer to both entities collectively as "Roizman." In Baltimore City, all rental dwellings are required to be licensed. The property was unlicensed from August 15, 2019 to July 14, 2020. The complaint[3] alleges that Roizman collected and retained rent from tenants for the period that the property was unlicensed, refused to return the rent, and sought to collect unpaid rent that was owed during the period when the property was unlicensed.

Assanah-Carroll filed a class action complaint in the federal district court against Roizman, as well as the Law Offices of Edward J. Maher, P.C. and Edward J. Maher ("Maher")—the latter being the attorney and law firm that Roizman retained to assist with the collection of unpaid rent that was owed during the period when the landlord did not have a license. For ease of reference, we will refer to Maher and the law firm collectively as the "Law Office." The complaint was filed on behalf of Assanah-Carroll and members of a putative class comprised of other tenants who resided in the 146-unit apartment building during the unlicensed period. Roizman filed a motion to dismiss, in which the Law Office joined.

Before ruling on the motion to dismiss, the federal district court, with the parties' consent, determined that it was advisable to consider our response to the certified questions presented herein, as well as our opinion in *Aleti v. Metropolitan Baltimore, LLC*, 479 Md. 650 (Filed July 28, 2022), which we issue simultaneously herewith.

---

[3] The operative complaint is the First Amended Class Action Complaint and Demand for Jury Trial (hereinafter referred to as the "complaint").

4

### B. Facts Set Forth in the Certification Order

In connection with our consideration of the questions of law presented herein, we accept the following facts set forth in the federal district court's certification order, which are based upon Assanah-Carroll's allegations contained in the complaint filed in that court.

### 1. Facts Related to Assanah-Carroll's Voluntary Rent Payments Made During the Unlicensed Period

Assanah-Carroll leased an apartment in a residential multi-unit building in Baltimore City, owned and operated by Roizman. When she began living in the apartment, the property had a valid license under the Baltimore City Code. During Assanah-Carroll's tenancy, the license lapsed for approximately one year, and thereafter the property became properly licensed again, and continues to be properly licensed.

Assanah-Carroll made rental payments during the period when the property's license had lapsed. She stopped making rental payments when she learned that the property's license was not in effect. When she learned the property was again licensed, she resumed making rental payments.

Assanah-Carroll does not allege that her dwelling unit was uninhabitable or that the value of the lease was diminished by any condition of the property caused by the lack of licensure. Her claim for damages[4] under the MCDCA and MCPA is based solely upon the

---

[4] Assanah-Carroll characterizes her effort to recoup her rent payments as "damages." As we explain more fully in this opinion, the rent payments she seeks to recover are not damages—rather, she is seeking restitution. As Dan B. Dobbs explains, "*restitution* is not *damages;* restitution is a restoration required to prevent unjust enrichment." *Law of Remedies: Damages-Equity-Restitution*, 376 (3d ed. 2018).

5

fact that the property was not licensed. She alleges that the entire rental payment for any unlicensed period constitutes damages.

2. *Facts Related to the Law Office's Efforts to Collect Unpaid Rent Attributable to the Unlicensed Period*

On behalf of their clients, the Law Office filed summary ejectment actions in the District Court of Maryland sitting in Baltimore City to collect unpaid rent that would have been owed during the period that the property was unlicensed. Assanah-Carroll made a payment for rent incurred during the period in which the property was unlicensed in order to redeem her lease pursuant to a final judgment of the Baltimore City District Court.

Assanah-Carroll alleges that the collection of rent during the unlicensed period violated the Baltimore City Code, and that those payments constitute damages under the MCDCA and MCPA and must be refunded. For rent that was unpaid, she alleges that attempting to collect unpaid back rent for months when the property was not licensed, even though the property is currently licensed, violates the Baltimore City Code. She further asserts that the full amount of the unpaid rental payments constitutes damages under the MCDCA and MCPA.

**II**

**Discussion**

Baltimore City, like many other local governments in Maryland, has enacted a public local law governing residential rental licenses and inspections (sometimes hereinafter referred to as the City's "rental license law"). The City's rental license law has been around for many decades. The provisions of the Baltimore City Code that establish

6

the residential licensing and inspection requirements are codified in Article 13, Subtitle 5 of the Baltimore City Code.  Under the applicable provisions of the Baltimore City Code, a person may not rent or offer to rent a residential dwelling unit[5] without a rental license issued by the Baltimore City Housing Commissioner.  Baltimore City Code Art. 13, § 5-4(a)(1).[6]  As a prerequisite to the issuance of an initial license or a renewal license, the unit must pass an inspection that certifies compliance with various housing codes.  § 5-7. Violators of the rental license law may be subject to criminal and civil penalties, including a daily fine of $1,000 for every day that the violation continues.  §§ 5-25, 5-26.[7]

In 2018, the Baltimore City Council adopted Bill 18-0185, which amended certain sections of Article 13, Subtitle 5.  The Bill effectuated two significant changes to the City's rental license laws.  First, it expanded the application of the City's rental license and inspection requirements to *all* non-owner-occupied dwellings rather than just multi-unit properties.  *Aleti*, Op. at 8.  Second, it required property owners to hire third-party licensed home inspectors (instead of City inspectors) to complete the rental inspections prior to

---

[5] The Baltimore City Code Article 13, § 5-1(g) defines "rental dwelling" as: "(1) any multiple-family dwelling; (2) any rooming house; and (3) any non-owner-occupied dwelling unit in a 1- or 2-family dwelling that is leased or rented or offered or available for lease or rental in exchange for any form of consideration."

[6] All references to the Baltimore City Code are to Article 13.  For the sake of brevity, we shall refer to all provisions of Article 13 by the applicable subtitle section reference. For example, Art. 13 § 5-4 shall be referred to as "§ 5-4."

[7] In *Aleti v. Metropolitan Baltimore, LLC*, 479 Md. 650 (Filed July 28, 2022), we more fully describe the statutory scheme of the City's rental license law, including the amendments made to the licensing requirements in 2018.

receiving a rental license, thereby shifting the administrative burden associated with those inspections from the City to the property owner.[8]  *Id.* at 8–9.

In connection with the expansion of the application of the City's rental and inspection requirements to *all* owner-occupied dwelling units, Bill 18-0185 included an amendment to § 5-4.  Prior to the 2018 amendment, § 5-4 stated as follows: "No person may: operate any multiple-family dwelling or rooming house without a license to do so from the Commissioner."  Bill 18-0185 modified the language in § 5-4(a) to read as follows:

**§ 5-4.  License Required.**

(a) *In general.*

Except as provided in subsection (b) of this section, no person may:[9]

(1) rent or offer to rent to another all or any part of any rental dwelling without a currently effective license to do so from the Housing Commissioner; or

(2) charge, accept, retain, or seek or collect any rental payment or other compensation for providing to another the occupancy of all or any part of any rental dwelling unless the person was licensed under this subtitle at both the time of offering to provide and the time of providing this occupancy.

---

[8] The 2018 amendment also made additional changes, such as implementing a tiered license expiration based upon the property owner's compliance with the local laws. However, the salient substantive changes related to the expansion of the license and inspection requirements to all non-owner-occupied dwellings and the privatization of the inspection process.

[9] Section 5-4(b) contains an exception to the license requirement established in subsection (b) for any rental dwelling that is owned and operated by the Housing Authority of Baltimore City.

Assanah-Carroll alleges that the language set forth in § 5-4(a)(2), which came into existence with the adoption of Bill 18-0185, gives her a right to maintain a private action under the MCPA to obtain recovery of the rent that she paid during the period that the property was unlicensed without showing that she suffered any actual injury or damages from Roizman's lack of licensure. She contends that the City's enactment of this local law is "an express prohibition on the collection or retention of rent where a property was unlicensed at the time the occupancy was provided or at the time it was offered" and that the "plain language" of this local law "requires forfeiture of the prohibited rent regardless of whether the apartments were uninhabitable." Unlike the tenants in *Aleti*, Assanah-Carroll does not allege that § 5-4(a)(2) creates its own implied private right of action to pursue such a remedy. Instead, she asserts that § 5-4(a)(2) establishes a judicial remedy of restitution that she may pursue by filing a private action under the MCPA. Stated another way, Assanah-Carroll is asserting that Baltimore City has enacted a *local law* that provides her with *additional remedies* under a *state statute*.

To consider Assanah-Carroll's legal argument, we start our discussion by examining the statutory remedies provided by the General Assembly to consumers under the MCPA for violations of the Act, as well as our case law spanning 30 years which has consistently interpreted these remedies. The remedies established by the Maryland General Assembly within the context of the MCPA, and our case law interpreting the same, are particularly instructive here because "the creation of new causes of action in the courts has traditionally been done either by the General Assembly or by this Court under its authority to modify the common law of this State." *McCrory Corp. v. Fowler*, 319 Md. 12, 20 (1990),

9

*superseded by statute as stated by Wash. Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 627–29 (2010). And, as discussed in detail below, if we were to hold that the Baltimore City Council, in fact, intended to enact a local law purporting to modify the judicial remedies expressly provided under a state statute—the MCPA—such remedies would be inconsistent with the remedies provided by the plain language of the MCPA as consistently interpreted by this Court.

## A. Maryland Consumer Protection Act

In 1973, the Maryland General Assembly enacted the MCPA, which is set forth in Maryland Code (1974, 2013 Repl. Vol., 2021 Supp.), Commercial Law Article ("CL") § 13-101, *et. seq.* The purpose of the MCPA is to "set certain minimum statewide standards for the protection of consumers across the State . . . ." CL § 13-102(b)(1). In enacting the MCPA, the General Assembly determined that the State "should take strong protective and preventative steps to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices and to prevent these practices from occurring in Maryland." CL § 13-102(b)(3). The General Assembly further instructed that the MCPA shall be "construed and applied liberally to promote its purpose." CL § 13-105. To that end, the MCPA prohibits all trade practices that are unfair, abusive, or deceptive in, among other things, the collection of consumer debts. *See* CL §§ 13-301(14)(iii); 13-303(5).

Section 13-303 of the MCPA generally prohibits unfair, abusive, or deceptive trade practices, and § 13-301 contains a nonexclusive list of practices that are defined to be unfair, abusive, or deceptive, and include any:

10

(1)     False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency or effect of deceiving or misleading consumers;[10]

(2)     Representation that: (1) Consumer . . . realty . . . [has] a sponsorship, approval, accessory, characteristic . . . which they do not have;

(3)     Failure to state a material fact if the failure deceives or intends to deceive[.]

We have held that a landlord who advertises and rents an unlicensed dwelling in violation of the Baltimore City rental license law violates CL § 13-301(1), (2), and (3). *See Golt v. Phillips*, 308 Md. 1, 9 (1986). However, as discussed below, simply establishing a violation of the MCPA does not entitle a consumer to a right to restitution of rent paid that would otherwise be owed in the absence of a violation.

The Act not only defines the prohibited practices—it also provides separate public and private enforcement provisions, each with their own remedies. We recently described the MCPA as "provid[ing] an array of options in enforcing the Act, some of them punitive in nature, designed to protect the public at large by punishing the wrongdoer, some designed more particularly to benefit individual victims of statutory violations, [and] some having a dual purpose, depending on the circumstances." *Linton v. Consumer Protection Division*, 467 Md. 502, 515 (2020). In *Linton*, we discussed at length the distinction between the statutory relief available to consumers under the MCPA for civil damages, and the

---

[10] Under the Maryland Consumer Protection Act ("MCPA"), "consumer realty" is defined as real property that is "primarily for personal, household, family or agricultural purposes." CL § 13-101(d)(1). "Consumer" is defined as an "actual or prospective purchaser, lessee, or recipient of consumer goods, consumer services, consumer realty, or consumer credit." CL § 13-101(c)(1). Under these definitions, residential tenants who lease real property qualify for protection under the MCPA. *See Golt v. Phillips*, 308 Md. 1, 8 (1986).

11

Division's ability to recover restitution and disgorgement of funds received by defendants through their statutory misconduct. *Id.* at 515–21. We classified the statutory enforcement options under the MCPA as falling within three categories. *Id.* at 515–16.

### 1. *Public Enforcement by the Division*

In the first category are purely public enforcement measures—consisting of civil penalties that the Consumer Protection Division ("Division") of the Office of the Attorney General, may impose against "merchants"[11] who violate the Act, *see* CL § 13-410, as well as criminal penalties, *see* CL § 13-411. Such actions may be initiated by a consumer complaint or a Division investigation. We described the Division's broad powers to enforce the MCPA as including "the power to receive and investigate consumer complaints, initiate . . . investigation[s] of any possibly unfair and deceptive trade practice, issue cease and desist orders, adopt rules and regulations . . . and seek a temporary or permanent injunction in a civil enforcement proceeding." *Consumer Protection Div. v. Consumer Publ'g*, 304 Md. 731, 745 (1985). Violators of the MCPA may also be criminally prosecuted. CL § 13-411.

### 2. *Private Right of Action*

In addition to these public enforcement provisions described above, the Legislature has also provided for a private action for damages by a consumer who has been subjected to a practice that is prohibited under the MCPA. CL § 13-408 provides in pertinent part:

> (a) *Actions authorized.* — In addition to any action by the Division or Attorney General authorized by this title and any other action otherwise

---

[11] "Merchant" is defined as "a person who directly or indirectly either offers or makes available to consumers any consumer goods, consumer services, consumer realty, or consumer credit." CL § 13-101(g).

authorized by law, any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title.

(b) *Attorney's fees.* — Any person who brings an action to recover for injury or loss under this section and who is awarded damages may also seek, and the court may award, reasonable attorney's fees.

(c) *Frivolous actions.* — If it appears to the satisfaction of the court, at any time, that an action is brought in bad faith or of a frivolous nature, the court may order the offending party to pay the other party reasonable attorney's fees.

As we will discuss more fully below, for more than 30 years, we have consistently interpreted the plain language of CL § 13-408 as requiring that a plaintiff pursuing a private action under the MCPA must prove "actual injury or loss." *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 143 (2007); *CitaraManis v. Hallowell*, 328 Md. 142, 153 (1992).

> 3. *The Right of the Attorney General and the Division to Seek Disgorgement and Restitution Remedies Through Public Enforcement That May Benefit Individual Consumers*

"In the third category are remedies that the [Division] may pursue to protect the public, directly or indirectly *and* to provide relief to individual [consumers]." *Linton*, 467 Md. at 516 (emphasis in original). "CL § 13-406 permits the Attorney General to sue for an injunction to prohibit persons from violating the Act, which can aid both the public and one or more [consumers], depending on what is sought to be enjoined." *Id.* In addition to providing injunctive relief, CL § 13-406(c) "permits the court to restore to a person any money or real or personal property acquired from the person by means of a prohibited practice." *Id.* (cleaned up). We observed that "[a]lthough there is an indirect benefit to the public from that provision in terms of inflicting some economic pain on the violator, which,

13

depending on the circumstances, could be substantial, it is clearly designed as well to benefit individual victims." *Id.*

In *Linton*, we also pointed out an additional enforcement option in the third category—set forth in CL § 13-403(b)(1)(i)—which "permits [the Division], as part of a cease and desist order, to order the violator 'to take affirmative action, including the restitution of money or property.'" *Id.* (some quotation marks omitted). We observed that "[r]estitution also is provided for in [CL § 13-403(b)(1)(ii)], which allows the cease and desist order to contain any stipulation or condition listed in [CL] § 13-402(b)." *Id.*

As we stated in *Linton*, the MCPA does not mention the word "disgorgement," nor does it define the word "restitution." *Linton*, 467 Md. at 517. We observed that the "connection between those terms was supplied by this Court in *Consumer Protection v. Consumer Pub[lishing]*, in which the Court first explored in any depth the purpose and meaning of the then-relatively new [MCPA]." *Id.* In *Linton*, we confirmed "a critical holding" in *Consumer Publishing*—which is this Court's adoption of the distinction between *civil damages* and *disgorgement/restitution. Id.* at 519. Because Assanah-Carroll is seeking the remedy of restitution or disgorgement of rent payments within the context of a private action brought under CL § 13-408, it is useful to revisit this distinction.

In *Consumer Publishing*, the Court explored the purpose and meaning of the then-relatively new MCPA. 304 Md. 731. One issue was whether, as part of a cease and desist order, the Division could order restitution when there was no evidence of reliance by consumers on the company's misleading advertisements. *Id.* at 775. In the context of this issue, we looked at the meaning of restitution and contrasted it with that of civil damages.

*Id.* at 776. In doing so, this Court aligned itself with the views of Professor Dan. B. Dobbs,

expressed in Dobbs, *Law of Remedies* § 4.1 at 224 (1973):

> "The damages recovery is to compensate the plaintiff and it pays him, theoretically, his losses. The restitution claim, on the other hand, is not aimed at compensating the plaintiff but at forcing the defendant to disgorge the benefits it would be unjust for him to keep . . .
>
> Restitutionary recoveries often amount to about the same as the plaintiff's losses, and thus serve many of the compensatory purposes served by a damages recovery. The justification lies, however, in the avoidance of unjust enrichment on the part of the defendant."

*Consumer Publishing*, 304 Md. at 776.[12] Normally, the Court continued, a plaintiff

seeking disgorgement/restitution must show reliance on the misrepresentation. *Id.* at 777.

After reviewing case law from other jurisdictions, we concluded that the reliance

requirement is relaxed when the remedy is pursued by a government consumer protection

agency. *Id.* at 779–81. We similarly determined that under the MCPA, "the Division may

include a general restitution provision in a cease and desist order without direct proof of

consumer reliance." *Id.* at 781.

In *Linton*, after discussing *Consumer Publishing* and noting that the principles

enunciated in that case have been "confirmed several times by this Court and applied by the

---

[12] As we noted in *Linton v. Consumer Protection Division*, 467 Md. 502, 518 n.5 (2020), Professor Dobbs later updated his 1973 book. The current version is Dan B. Dobbs and Caprice L. Roberts, *Law of Remedies*, 3d ed. (2018). The authors confirm the difference between restitution and civil damages: "Restitution measures the remedy by defendant's gain and seeks to force disgorgement of that gain. It differs in its goal or principle from damages, which measures the remedy by plaintiff's loss and seeks compensation for that loss." *Id.* at 374. They give a simple example: the defendant steals [or obtains by fraud] the plaintiff's watch, which has a value of $30, but which the defendant sells for $40. The plaintiff's loss and compensatory damage is $30, but a restitution recovery is $40 – the measure of the defendant's unjust enrichment. *Id.*

15

Court of Special Appeals and the U.S. Court of Appeals for the Fourth Circuit," we once again affirmed the distinction between civil damages and disgorgement/restitution, stating that restitution through disgorgement is not in the nature of civil damages. *Linton*, 467 Md. at 519–20 (citing *Consumer Protection v. Morgan*, 387 Md. 125, 164–66 (2005); *Luskin's v. Consumer Protection*, 353 Md. 335, 383 (1999); *CitaraManis v. Hallowell*, 328 Md. 142, 152–53 (1992); *State v. Andrews*, 73 Md. App. 80, 85–86 (1987); *In re Edmond*, 934 F.2d 1304 (4th Cir. 1991)). We pointed out that "restitution through disgorgement has a punitive element to it, it partakes of a public remedy, not just a personal one, especially when pursued by a government agency authorized by statute to pursue it." *Linton*, 467 Md. at 520.

Notably, the right to seek disgorgement/restitution is solely within the purview of the Division. In other words, the MCPA does *not* confer a remedy of restitution as part of the consumer's private action under CL § 13-408. The consumer's private remedy is limited to "bring[ing] an action to recover for *injury or loss sustained by him* as a result of a practice prohibited by this title." CL § 13-408(a) (emphasis added). Only the Attorney General and the Division have the right to pursue the remedy of disgorgement/restitution— either in connection with the right to seek injunctive relief under CL § 13-406 or the Division's authority to enter a cease and desist order under CL § 13-403(b)(1)(i) and (ii). Additionally, the Division's ability to order restitution upon a finding of a statutory violation is not unlimited. "For the Division to order a violator to pay restitution to a particular individual, . . . the Division must determine that the consumer relied upon the misrepresentation." *Morgan*, 387 Md. at 163. "In Maryland, '[t]here is a reliance element in restitution.'" *Id*. (quoting *Luskin's,* 353 Md. at 385); *see also Consumer Protection v.*

16

*Outdoor World*, 91 Md. App. 275, 291 (1992) (noting that "actual restitution may not be ordered in the absence of some evidence that the individual purchaser was deceived by and relied upon the offending communication"); *Consumer Publishing*, 304 Md. at 781 (holding that a blanket order or automatic restitution to all consumers was improper because restitution to particular purchasers was appropriate only after verification of actual reliance by those purchasers on the company's misleading or deceptive advertisements).

## B. The Maryland Consumer Debt Collection Act

The MCDCA was first enacted in 1972 and is codified at CL § 14-201, *et. seq.* It applies to any "person collecting or attempting to collect an alleged debt arising out of a consumer transaction." CL § 14-201(b) (defining "collector"); *see also Nationstar Mortgage, LLC v. Kemp*, 476 Md. 149, 161 (2021) (explaining that "[t]he MCDCA regulates the conduct of anyone who collects—or attempts to collect—a debt arising from a consumer transaction[]"). The MCDCA prohibits eleven categories of conduct when collecting or attempting to collect a debt, including: claiming, attempting, or threatening to enforce a right with knowledge that the right does not exist. CL §§ 14-202(8). "To prove a claim under this provision of the MCDCA, a complainant must establish two elements: (1) the debt collector did not possess the right to collect the amount of debt sought; and (2) the debt collector attempted to collect the debt knowing that it lacked the right to do so." *Chavis v. Blibaum & Assocs., P.A.*, 476 Md. 534, 553 (2021) (cleaned up). The "with knowledge" element of this subsection of the MCDCA "require[s] proof that a debt collector claimed, attempted, or threatened to enforce the non-existent right 'with actual knowledge or with reckless disregard as to the falsity of the existence of the right.'"

17

*Chavis*, 476 Md. at 563 (quoting *Fontell v. Hassett*, 870 F. Supp. 2d 395, 407 (D. Md. 2012)) (internal quotation marks and citations in *Fontell* omitted).  Under CL § 14-203, "[a] collector who violates any provision of [the MCDCA] is liable for any damages proximately caused by the violation, including damages for emotional distress or mental anguish suffered with or without accompanying physical injury."  Like the MCPA, actual damages are an element of any MCDCA claim.[13]

Although MCDCA authorizes a private action (CL § 14-203), it does not provide for its own public enforcement.  Rather, the General Assembly incorporated a provision into the MCPA making it an "unfair or deceptive trade practice" to engage in conduct that violates the MCDCA.  CL § 13-301(14)(iii).

### C. Our Jurisprudence Concerning a Tenant's Right to Bring a Private Action Under the MCPA Against a Landlord for Renting a Dwelling Without a License

In the rental housing context, our jurisprudence firmly establishes a tenant's right to bring a private action under the MCPA where a landlord violates a local rental license law, and the tenant can prove that he or she suffered actual injury or loss in connection with the unlicensed status of the property.  It similarly rejects the tenant's ability to bring an action seeking restitution or disgorgement of rent under a private action filed under the MCPA based upon lack of licensure alone.

---

[13] Two provisions of the MCPA also apply to consumer debt collection practices. CL § 13-303(5) prohibits a person from "engag[ing] in any unfair, abusive, or deceptive trade practice . . . in . . .[t]he collection of consumer debts[.]" A violation of the MCDCA also constitutes a *per se* violation of the MCPA as an "unfair, abusive, or deceptive trade practice."  CL § 13-301(14)(iii).

18

In *Golt v. Phillips*, 308 Md. 1 (1986), we first considered a tenant's private action under the MCPA filed against his landlord, who was unlicensed under the Baltimore City rental license law. In that case, not only was the landlord unlicensed, but the apartment was uninhabitable. *Id.* at 5–6. After the tenant moved in and the landlord refused to make repairs, the tenant called the City, which performed an inspection. *Id.* The housing inspector discovered that the landlord did not have the necessary license or inspection to operate the building as a multiple family dwelling. The inspector also found numerous housing code violations, including the lack of toilet facilities in the tenant's apartment, defective doors and locks, and the lack of fire exits and fire doors. *Id.* at 6. The City issued violation notices to the landlord, ordering the landlord to correct the violations and either obtain a proper license or discontinue renting the multiple family dwelling. *Id.*

Within five days of the inspection, the landlord sent the tenant an eviction notice informing him that the apartment was not properly licensed and was being illegally rented. *Id.* The landlord ordered the tenant to vacate the apartment. *Id.* The tenant vacated and moved to a new apartment that cost considerably more than the rent that was advertised for the apartment that turned out to be unlicensed. *Id.* After the tenant moved out and requested the return of his deposit, the landlord informed him that he was withholding a portion of the security deposit for rent and utility charges. *Id.* The tenant rejected the landlord's tender of the balance of the deposit and filed suit in District Court. *Id.* The tenant's action included a claim that the landlord's actions violated the MCPA. *Id.* The landlord filed a counterclaim for additional rent and other monies allegedly due. *Id.*

19

After the District Court denied the tenant any relief under the MCPA, and the circuit court dismissed the tenant's appeal, we granted the tenant's petition for a writ of *certiorari* to determine whether the tenant had an action under the MCPA against the landlord. We first determined that advertising and renting an unlicensed dwelling violates CL § 13-301(1), (2), and (3). *Id.* at 9. After concluding that the landlord's action in renting the unlicensed dwelling constituted an unfair and deceptive trade practice under the MCPA, we considered the "the amount of damages that may be received under the [M]CPA." *Id.* at 11.

We observed:

> Section 13-408 of the [M]CPA sets forth the private remedy created by the act: "any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title." *This private remedy is purely compensatory; it contains no punitive component.* Indeed, any punitive assessment under the [M]CPA is accomplished by an imposition of a civil penalty recoverable by the State under § 13-410, as well as by criminal penalties imposed under § 13-411. *Thus, in determining the damages due the consumer, we must look only to his actual loss or injury caused by the unfair or deceptive trade practices.*

*Id.* at 12 (emphasis added). We held that the tenant was entitled to compensatory damages consisting of restitution of the rent, which he had paid for three months of the uninhabitable apartment, and consequential damages, such as the cost of moving from the premises and the additional cost of substitute housing for the remainder of the term of the lease that he had entered. *Id.* at 13–14.

In *CitaraManis v. Hallowell*, 328 Md. 142 (1992), we considered whether a tenant could maintain a private action under the MCPA or under a common law action for restitution, to recover rent paid in connection with the property they had rented that was

20

not licensed as required by the Howard County Code. Unlike the tenant in *Golt*—who had established that the property was not only unlicensed but also uninhabitable—the tenants did not allege that the lack of licensure caused them any injury or loss, and the condition of the house was acceptable during the tenancy, which lasted one-and-a-half years. *Id.* at 145. However, after learning that the property was not licensed, they filed suit to recover the amounts they had paid in rent as damages under the MCPA and as restitution of voluntary payments made under an illegal lease. *Id.*

After the circuit court ruled in favor of the tenants, we reversed the circuit court's judgment. We pointed out that under the plain language of private action provisions of the MCPA, a plaintiff must prove "actual injury or loss sustained." *Id.* at 151 (citing CL§ 13-408(a)) (cleaned up). We discussed the public and private remedies that are available under the MCPA, observing that a consumer who has been subjected to an unfair, abusive, or deceptive trade practice "may elect to utilize either the public or private enforcement proceedings available under the [M]CPA or may utilize both public and private enforcement proceedings, either simultaneously or in the alternative." *Id.* We noted that in a *public proceeding* under the MCPA, *any* prohibited practice is a violation *regardless* of whether the "consumer in fact has been misled, deceived, or damaged as a result of that practice." *Id.* at 152 (quoting CL § 13-302) (emphasis added). By contrast, to maintain a *private* enforcement proceeding, we pointed out that the express terms of the MCPA "*only* permit[] a consumer 'to recover for *injury or loss* sustained by him as the result of a practice prohibited by this title.'" *Id.* (quoting CL § 13-408(a)(1)) (emphasis added).

21

Based upon the language in CL § 13-408(a), we concluded that the private action "therefore requires an aggrieved consumer to establish the nature of the actual injury or loss that he or she has allegedly sustained as a result of the prohibited practice." *Id.* We stated that "[t]his statutory construction creates a bright line distinction between the public enforcement remedies available under the [M]CPA, and the private remedy available under [CL] § 13-408(a)." *Id.* We also observed that "*awarding full restitution of the rent paid by the tenants who offered no proof of actual injury or loss would be in the nature of a punitive remedy*," serving to penalize the landlords for their failure to obtain a license and to serve as a general deterrent to similar conduct by other landlords generally. *Id.* at 153 (emphasis added). We explained that CL § 13-408(a) "was not intended to punish the landlord or set an example for similar wrongdoers." *Id.* Accordingly, we held that the plaintiff tenants could only recover on their private MCPA claim against their landlord for deceptive trade practices arising from renting an unlicensed apartment if they could prove that the unlicensed condition caused them to suffer an "actual injury or loss." *Id.*

In *Galola v. Snyder*, a companion case to *CitaraManis*, we held that the circuit court erred in granting summary judgment in favor of a tenant against an unlicensed landlord based on upon proof of voluntary payment of rent. 328 Md. 182, 185–86 (1992). We summarized our interpretation of the private right of action under the MCPA in the context of a tenant's claim against an unlicensed landlord as follows:

> [The MCPA] provides a private cause of action . . . for a tenant of residential property who has been the victim of unfair and deceptive trade practices by his or her landlord. Rental of a dwelling that has not been

22

licensed as required by a local housing code is an unfair and deceptive trade practice by a landlord. Nevertheless, in such an action the tenant is limited to recovering actual loss or injury caused by the deceptive trade practices. A tenant is not entitled to damages under § 13-408(a) of the [M]CPA solely upon proof that the leased property was not licensed as required by law; rather, the tenant must prove actual loss or injury caused by lack of licensure. Furthermore, voluntary payment of rent under an unenforceable lease does not entitle a tenant to restitution of that rent unless the tenant can establish that he or she was provided less than she had bargained for in the lease.

*Id.* However, unlike the facts in *CitaraManis*, there was evidence that the tenant was harmed because the property contained defects such as cracks, holes, loose paint and plaster, windows that admit rain, defective heat and air conditioning, dampness in habitable room, and water in the basement. *Id.* at 184. As such, although we held that the trial court improperly granted summary judgment for the tenant on proof of no more than the tenant's voluntary rent for the unlicensed property, we remanded the case for a trier of fact to determine whether the tenants suffered actual loss or injury arising from the condition of the unlicensed property. *Id.* at 186.

In *McDaniel v. Baranowski*, 419 Md. 560 (2011), we reaffirmed the analytical framework that we set forth in *CitaraManis.* In *McDaniel*, we considered whether an unlicensed landlord could initiate a summary ejectment proceeding for a tenant's failure to pay rent. *Id.* at 562–63. We will discuss our holding on that issue later when we consider the second certified question. We also considered whether the District Court erred in denying the tenant's counterclaim that she filed under the MCPA because she failed to prove actual damages. *Id.* at 563, 587. We compared the tenant's allegation in *McDaniel* with the allegations made by the tenants in *CitaraManis* and *Golt*. We

23

noted that in *CitaraManis*, the tenant had not alleged or proven that the rental dwelling "was unclean, unsafe, uninhabitable or unsuitable in any regard," or that they had suffered any diminution of the rental value of the property resulting from the lack of licensure. *McDaniel*, 419 Md. at 587 (quoting *CitaraManis*, 328 Md. at 149). By contrast, we pointed out that in *Golt*, the tenant "demonstrated actual injury, in both the diminution of value of the premises due to defects in the unit, which did not even have toilet facilities, and also in the cost of securing suitable housing." *Id.* We determined that the "[t]he present case is analogous to *CitaraManis*, because [the tenant] failed to present any evidence that she sustained any actual damages, such as bills for medical treatment, loss of wages, or the cost of securing suitable substitute housing, for example." *Id.* at 587–88. Based upon this analysis we agreed with the District Court that the tenant "failed to prove actual loss or injury, a prerequisite to recovery under the [MCPA]." *Id.* at 588.

To summarize our holding in *CitaraManis*, which we applied in *Galola* and *McDaniel*, a tenant may only pursue a private action under the MCPA against an unlicensed landlord where the tenant can prove that the unlicensed condition caused the tenant to suffer an "actual injury or loss." 328 Md. at 151. Simply alleging a lack of licensure is not enough.

### D. Analysis Pertaining to Certified Question 1

Turning to the issue presented in certified question 1, Roizman asserts that this Court's holding in *CitaraManis*, which we applied in *Galola*, and *McDaniel*, also applies to Assanah-Carroll's MCPA claim. Roizman points out that, like the tenants in

24

*CitaraManis*, Assanah-Carroll does not allege that her dwelling unit was uninhabitable or that the value of the lease was diminished by any condition of the property caused by the lack of licensure. Roizman notes that Assanah-Carroll's claim for restitution of rent under the MCPA is based solely upon the fact that the property was not licensed, which she contends constitutes "damages." Roizman contends that we rejected the same argument 30 years ago in *CitaraManis*, which has not been overturned by this Court. Roizman further points out that, in the years since *CitaraManis* was decided, our interpretation of the private action arising under CL § 13-408(a) as requiring "actual injury or loss" has not been modified or overruled by the Legislature.

Roizman also asserts that, in enacting Bill 18-0185—which amended the language in § 5-4(a)—the Baltimore City Council did not intend to create a new remedy under the MCPA. Roizman further contends that, even if the City Council had expressly intended to create such a remedy, the City Council lacked the legal authority to adopt a local law that purports to establish expanded judicial remedies under a private right of action established by the General Assembly. Roizman also argues that, if Assanah-Carroll's interpretation of § 5-4(a)(2) prevails, it would have the effect of improperly modifying (and would in fact, extinguish) the actual damages requirements of the MCPA. Simply put, according to Roizman, the Baltimore City Council cannot enact a local law that has the effect of circumventing the statutory requirement that a consumer prove actual damages when filing a claim under the MCPA.

Assanah-Carroll argues that her MCPA claim is different from the tenant's claim in *CitaraManis* because her claim arises out of the license requirements under the Baltimore

25

City local law instead of the Howard County local law. Specifically, Assanah-Carroll argues that the City Council's enactment of § 5-4(a)(2) provides her with the right to maintain a private action under the MCPA to obtain the judicial remedy of restitution of rent based upon lack of licensure alone. According to Assanah-Carroll, she is entitled to seek this judicial remedy in a private action under the MCPA because the City Council has made an "express policy decision" to permit the recovery of sums paid pursuant to an "illegal contract."

For the reasons set forth below, we agree with Roizman that § 5-4(a)(2) does not give Assanah-Carroll a right to seek the remedy of restitution or disgorgement of rent that was voluntarily paid in connection with the occupancy of an unlicensed dwelling under the MCPA.

> 1. *There Is Nothing in the Language of § 5-4(a) or Its Legislative History to Suggest that the Baltimore City Council Intended to Create a Judicial Remedy that Could Be Pursued by Filing a Private Action Under the MCPA*

In *Aleti*, we determined that there is nothing in the legislative history of Bill 18-0185 to suggest that the Baltimore City Council intended to create a stand-alone implied private right of action under § 5-4(a)(2) that would enable City tenants to pursue a judicial remedy of restitution of rent. *Aleti*, op. at 27–32. We will not repeat our analysis of that issue here. It is sufficient to simply note that, similarly, there is nothing in the legislative history of Bill 18-0185 to indicate that the City Council intended to create a judicial remedy entitling City tenants to seek restitution of rent that could be pursued within a private action arising under the MCPA. As we observed in *Aleti*, the City's Department of Law was asked to comment on the form and legal sufficiency of Bill 18-0185. If the City Council had intended to create a judicial remedy that could be pursued within a private action under

26

the MCPA that is *inconsistent* with the remedies expressly provide by the state statute, surely the City's legal counsel would have commented on that fact. Based upon our review of the legislative history that we outlined *Aleti*, we hold that City Council did not intend to create a judicial remedy enabling City tenants to seek restitution of rent as part of a private action brought under the MCPA.

2. *The Maryland General Assembly Has Not Given Baltimore City the Authority to Enact Local Laws to Alter or Circumvent the Remedies Provided Under the MCPA*

We also determine that, even if the Baltimore City Council intended to create modified or expanded remedies for City tenants that could be pursued by filing a private action under the MCPA or MCDCA, it lacked the authority to do so.

Baltimore City is a charter home rule jurisdiction under Article XI-A of the Maryland Constitution. On a number of occasions, we have pointed out that Article XI-A, which we commonly refer to as the Home Rule Amendment, enabled Baltimore City and counties "which chose to adopt a home rule charter, to achieve a significant degree of political self-determination." *Piscatelli v. Bd. of Liquor License Comm'rs*, 378 Md. 623, 633 (2003) (quoting *Holiday Universal, Inc. v. Montgomery Cty.*, 377 Md. 305, 313 (2003)) (additional quotations omitted). "Its purpose was to transfer the General Assembly's power to enact many types of county public local laws to the [Article] XI-A home rule counties." *McCrory*, 319 Md. at 16. In *McCrory*, we explained that the purpose of Article XI-A was to secure a "larger measure of home rule . . . to the people of the respective political subdivisions of the state *in matters of purely local concern*, in order that there should be the fullest measure of local self-government, and that these local

27

questions should thus be withdrawn from consideration by the General Assembly. . . ." *Id.* (quoting *State v. Stewart*, 152 Md. 419, 422 (1927)).

"Sections 1 and 1A of Article XI-A empower Baltimore City and the counties of Maryland to adopt a charter form of local government." *Id.* Article XI-A, § 2 of the Constitution requires the General Assembly to enact a grant of express powers for Baltimore City and the counties which have adopted home rule charters.[14] As it pertains to Baltimore City, most of the express powers granted by the General Assembly pursuant to Article XI-A, § 2 are contained in Article II of the Baltimore City Charter.[15]

Section 3 of Article XI-A provides:

> From and after the adoption of a charter by the City of Baltimore, or any County of this State, as hereinbefore provided, the Mayor of Baltimore and City Council of the City of Baltimore or the County Council of said County, subject to the Constitution and Public General Laws of this State, shall have full power to enact *local laws* of said City or County. . . upon all matters covered by the express powers granted as above provided . . . .

---

[14] Article XI-A, § 2 of the Maryland Constitution states:

> The General Assembly shall by public general law provide a grant of express powers for such County or Counties as may thereafter form a charter under the provisions of this Article. Such express powers granted to the Counties and the powers heretofore granted to the City of Baltimore, as set forth in Article 4, Section 6, Public Local Laws of Maryland [now codified as Article II of the Baltimore City Charter] shall not be enlarged or extended by any charter formed under the provisions of this Article, but such powers may be extended, modified, amended or repealed by the General Assembly.

[15] Some additional express powers are set forth in other public general laws. For example, the Land Use Article § 10-201 *et seq.* expressly grants zoning authority to the Mayor and City Council of Baltimore.

(Emphasis added). We have repeatedly emphasized that "Article XI-A 'does not constitute a grant of absolute autonomy to local governments.'" *Holiday Universal*, 377 Md. at 314 (quoting *McCrory*, 319 Md. at 17 (quoting *Ritchmount P'ship v. Bd. of Supervisors of Elections for Anne Arundel Cty.*, 283 Md. 48, 56 (1978))); *also citing H.P. White Lab., Inc. v. Blackburn*, 372 Md. 160, 167–68 (2002) ("As made clear by the language of Article XI-A, § 3 of the Constitution . . . the law making authority of a home rule county is limited to the power to enact *local* laws of said . . . County") (emphasis in original) (cleaned up); *Sweeney v. Hartz Mountain Corp.*, 319 Md. 440 (1990). Indeed, if an "ordinance enacted by a charter county does not constitute a 'local law' within the meaning of Article XI-A, it is beyond the authority of a charter county and, therefore, is unconstitutional." *Montgomery Cty. v. Broadcast Equities, Inc.*, 360 Md. 438, 441 n.1 (2000) (*citing McCrory*, 319 Md. at 17–24). In determining whether an ordinance is a "local law" or a "general law," we have described the distinction as follows:

> [A] local law in subject matter and substance is confined in its operation to prescribed territorial limits. A general law, on the other hand, deals with the general public welfare, a subject which is of significant interest not just to any one county, but rather to more than one geographical subdivision, or even to the entire state. Moreover, the Court has held that some statutes, local in form, are general laws, since they affect the interest of the whole state.

*McCrory*, 319 Md. at 18 (quoting *Steimel v. Board*, 278 Md. 1, 5 (1976) (quoting *Cole v. Secretary of State*, 249 Md. 425 (1968))) (internal citations and quotations omitted).

Where a charter county attempts to enact an ordinance on "matters of significant interest to the entire state," we have determined that it is not, in fact, "a local law" under Article XI-A. *Id.* at 19; *see also H.P. White Lab.*, 372 Md. at 160 (holding that Harford

29

County's anti-employment discrimination law was not a "local law" and was therefore unconstitutional under the Home Rule Amendment); *Gunpowder Horse Stables, Inc. v. State Farm Auto. Ins. Co.*, 108 Md. App. 612 (1996) (holding that a Baltimore County Code provision that purported to create a private right of action against the owner of an animal for damages caused by the animal was invalid under Article XI-A because it was not a "local law"; and also noting that a county may not create a new right of action between private parties concerning matters of statewide concern).

Even if we were to agree with Assanah-Carroll that Baltimore City intended to create a judicial remedy that could be pursued via a private action under the MCPA, the General Assembly, through the express powers granted to Baltimore City by statute and Article II of the Baltimore City Charter, has not conferred upon the City the authority to adopt a local law that alters the remedies provided under the MCPA—a *state* statute.

The Maryland Consumer Protection Act and its private and public enforcement provisions "affect matters of significant interest to the entire State." *McCrory*, 319 Md. at 20. The enforcement provisions provided under that Act apply uniformly *to all consumers across the State*. The Legislature has not conferred upon Baltimore City the authority to modify or circumvent the statutory remedies that uniformly apply to all consumers who are subject to a prohibited unfair, abusive, or deceptive trade practice.

Were we to accept Assanah-Carroll's argument that § 5-4(a)(2) gives Baltimore City tenants an expanded remedy to pursue restitution of rent within a private action under the MCPA, such a remedy would be inconsistent with the remedies provided under the plain language of CL § 13-408, as well as this Court's consistent interpretation of the statutory

remedies provided under the MCPA. As discussed above, the remedy of restitution or disgorgement has a punitive element to it[16]—it is only available under the MCPA within the context of a public enforcement proceeding filed by the Division or the Attorney General. *See Linton*, 467 Md. at 516. Moreover, as we explained in Part II.A. of this opinion, where the Division intends to order restitution to a particular individual or individuals, the Division must determine that the individual consumer relied upon the misrepresentation that forms the basis of the prohibited deceptive conduct. *See Morgan*, 387 Md. at 163 ("[f]or the Division to order a violator to pay restitution to a particular individual, . . . the Division must determine that the consumer relied upon the misrepresentation."); *Consumer Publishing*, 304 Md. at 781 (holding that a blanket order or automatic restitution to all consumers was improper because restitution to particular purchasers was appropriate only after verification of actual reliance by those purchasers on the company's misleading or deceptive advertisements). Such an interpretation would also be inconsistent with this Court's decisions in *CitaraManis*, *Galola*, and *McDaniel*, which expressly held that a tenant may not bring a private action under MCPA against an

---

[16] Indeed, we can imagine many instances where requiring the restitution/disgorgement of rent based upon a lack of license alone, would have a significant punitive element. As we recently noted in *Velicky v. Copycat Building, LLC*, 476 Md. 435 (2021), Baltimore City issues one rental license for an entire apartment unit. Under Assanah-Carroll's theory, if a single unit in a 146-unit building failed an inspection, which in turn caused the entire building to fail to qualify for a new license, the consequence would be that the landlord would be forced to refund to all the tenants in the building, any rent that was voluntarily paid for the duration of the lapsed license period without demonstrating that they were damaged by the lack of licensure. Such an expanded remedy is inconsistent with plain language of CL § 13-408(a), which requires a plaintiff to prove actual injury or loss arising from the violation of the Act in order to maintain a private right of action under the MCPA.

31

unlicensed landlord without proof that the unlicensed condition caused them to suffer an actual injury or loss—a statutory interpretation that has not been modified or overturned by the Legislature.

For these reasons, we hold that § 5-4(a)(2) does not provide Assanah-Carroll with a remedy of restitution of rent under the MCPA. We hold that the Baltimore City Council, in enacting Bill 18-0185, which added § 5-4(a)(2) to the City Code, did not intend to establish a judicial remedy that could be pursued by filing a private action under the MCPA. We further determine that even if the City Council had intended to create such a judicial remedy, it lacks the authority to adopt a local law that modifies the remedies established by the MCPA.

### E. Analysis Pertaining to Certified Question 2

Certified question 1 addressed the *tenant's* right to obtain restitution of rent where the payment is voluntarily paid. Certified question 2 involves a *landlord's* right to engage in debt collection activities, including pursuing claims against the tenant in court, where the tenant has failed to pay rent attributable to the unlicensed period. Specifically, we must determine whether a landlord who is *currently* licensed may engage in collection activity or initiate a summary ejectment action based upon the tenant's failure to pay rent during the period when the dwelling unit was unlicensed. In *CitaraManis*, we raised this very issue but left it undecided. 328 Md. at 158–159 (observing that "[h]ere, we need not decide whether lack of the required rental housing license, in and of itself and without

32

regard to the condition of the premises, would be sufficient to bar a landlord's claim for unpaid rent or for use and occupation[]").[17]

The parties once again direct us to the language of the Baltimore City Code § 5-4(a)(2) and focus their arguments on that section. Our holdings in *Aleti* and our answer to certified question 1 dispose of the argument that the specific language of the City Code establishes new rights or remedies that may be pursued by the tenants. We determine that our answer to question 2 similarly does not depend upon the specific language of any local law, but instead, is dependent upon established principles of common law that this Court has the authority to apply. As noted above, this Court has the authority to interpret and apply the common law. *See Plank v. Cherneski*, 469 Md. 548, 625–26 (2020) (affirming the existence of an independent cause of action for

---

[17] In his concurring and dissenting opinion, Judge Gould argues that *CitaraManis* should guide our analysis on the outcome of question 2. Gould, J., concurring and dissenting opinion ("Dissent"). Dissent, part A. The Dissent points out that in *CitaraManis*, we declined to apply the common law rule articulated in *Harry Berenter, Inc. v. Berman*, 258 Md. 290, 293 (1970) ("*Berenter*"); *Thorpe v. Carte*, 252 Md. 523, 529 (1969); *Smirlock v. Potomac Dev. Corp.*, 235 Md. 195, 203 (1964); *Snodgrass v. Immler*, 232 Md. 416, 421–22 (1963); *Goldsmith v. Mrfs. Liability Ins. Co.*, 132 Md. 283, 286 (1918) (collectively, the "*Berenter* cases") to permit the tenant to recover restitution of rent voluntarily paid on the basis that the contract was unenforceable because of the landlord's lack of licensure. We are not persuaded by the Dissent's analysis for two reasons. *First*, as the Dissent correctly points out, *CitaraManis* involved a *tenant's right to obtain restitution* in the form of rent voluntarily paid, instead of the *unlicensed landlord's right to collect unpaid rent* during the unlicensed period, and that "[t]hese are different causes of action with distinct elements." Dissent Op. at 7. *Second*, although in *CitaraManis*, we declined to apply the common law rule expressed in the *Berenter* cases to the tenant's claim for disgorgement/restitution, as we discuss *infra*, 19 years later, in *McDaniel v. Baranowski*, 419 Md. 560 (2011), we did, in fact, rely on the common law principle articulated in the *Berenter* cases to prohibit an unlicensed landlord from utilizing the summary ejectment statute, RP § 8-401, to collect unpaid rent owed in connection with an unlicensed rental property.

breach of fiduciary duty in Maryland and outlining the elements of the cause of action). In addition to our authority, the "common law rule may, without constitutional restraints, be changed or modified by legislative enactment[.]" *Johns Hopkins Hosp. v. Correia*, 405 Md. 509, 521 (2008) (internal quotations omitted).

As we explain below, in *McDaniel*, 419 Md. 560, we applied common law principles to prohibit a landlord from enforcing his contractual right to collect rent from a tenant by filing a summary ejectment proceeding during a period that the property was unlicensed. We determine that there is no reason to limit our holding in *McDaniel* to those situations where an unlicensed landlord is contemporaneously attempting to enforce a contractual right to collect rent by filing actions in the courts. We conclude that the same common law principles should apply when a landlord subsequently obtains a license but is attempting to collect rent that is attributable to the unlicensed period. We explain our reasons for extending the application of these common law principles below.

1. *Landlord's Contractual Remedies Arising from a Tenant's Failure to Pay Rent*

A landlord's right to receive rent is a contractual one. *Velicky v. Copycat Building, LLC*, 476 Md. 435, 448 (2021) (observing that "[a] landlord and tenant relationship arises when an individual occupies the real property of another with permission and for a consideration, which is usually in the form of the payment of rent.") (citing 49 Am. Jur. 2d *Landlord and Tenant* § 1 (2021)).

34

Where a tenant breaches a lease by failing to pay rent, the landlord has both common law and statutory remedies. Under the common law, a landlord may bring a breach of contract action against a tenant for unpaid rent that was owed during the tenancy after a tenant vacates the property. *See e.g.*, *Ben-Davies v. Blibaum & Assocs., P.A.*, 457 Md. 228 (2018). In addition to the common law breach of contract remedy, where a tenant is residing on the landlord's property and fails to pay rent, the General Assembly has enacted a streamlined and expedited process to enable the landlord to regain possession and obtain a judgment for money damages.

The landlord's statutory right of action, which is codified in § 8-401 of the Real Property Article ("RP") of the Maryland Code, commonly referred to as a "failure to pay rent" or "summary ejectment action," "arises pursuant to a contractual relationship between the landlord and tenant—whether express or implied, oral or written—and is based upon the tenant's failure to abide by his or her contractual obligation to pay rent." *Velicky*, 476 Md. at 453. "Summary ejectment proceedings empower the court to enter a money judgment for the amount of rent determined to be owing and also to issue an order for the tenant to yield possession of the premises when the jurisdiction over the tenant has been obtained." *Schuman, Kane, Felts & Everngam, Chartered v. Aluisi*, 341 Md. 115, 122 (1995) (internal quotation marks omitted).

As we have previously observed, "[s]ummary ejectment proceedings are expedited." *Cane v. EZ Rentals*, 450 Md. 597, 602 (2016). The summons issued by the court directs the tenant to appear in the District Court for a trial on the fifth day following the filing of the complaint and to show cause why the relief sought by the landlord should not be granted.

RP §§ 8-401(b)(3)(i)–(ii).  The court is authorized to adjourn the trial for one day to permit either party to procure necessary witnesses "in the interest of justice[,]" but may not adjourn the trial for a period of longer than one day unless all parties consent.  RP § 8-401(e)(1).  If judgment is entered in favor of the landlord, the statute provides that the court shall order possession to be given to the landlord within four days.  RP § 8-401(e)(3).

Because the summary ejectment action is based solely upon the tenant's obligation to pay rent, if the tenant tenders the rent due, plus costs prior to the entry of judgment, the action is dismissed.  If the court enters judgment in favor of the landlord, including possession of the premises, the tenant may redeem the leased premises if the tenant tenders to the landlord the amount of the judgment, as well as any court awarded costs and fees, at any time prior to the execution of the eviction order.  RP § 8-401(g)(1).  The tenant's right of redemption is no longer available if the tenant has had three judgments of possession within the previous 12 months.  RP § 8-401(g)(2).

The failure to pay rent or statutory summary ejectment action arising under RP § 8-401 is a powerful tool that enables the landlord to enforce his contractual right to collect unpaid rent in an efficient and expedient manner.  It provides the landlord with a statutory mechanism to receive not only possession (provided that the tenant has not exercised his right of redemption), but also a monetary judgment against the tenant for the unpaid rent.

Although a landlord has a right to file a statutory summary ejectment action arising from a tenant's failure to pay rent, this right is not unfettered.  Through the application of the common law, we have prohibited a landlord from initiating a summary ejectment proceeding to collect unpaid rent where the landlord lacks a rental license.

36

## 2. *The Common Law Exception to the Enforceability of a Contract Where License is Required for Performance*

"From the dawn of the common law tradition in England, courts have refused to implement those private contractual undertakings which, when measured against the prevailing mores and moods of society, contravene judicial perceptions of so-called 'public policy.'" *Maryland-National Capital Park & Planning Comm'n v. Washington Nat'l Arena*, 282 Md. 588, 605 (1978) (citations omitted). "Public Policy is that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public, or against the public good, which may be termed, as it sometimes has been, the policy of the law, or public policy in relation to the administration of the law." *Id.* (citing *Egerton v. Earl Brownlow*, 4 H.L. Cas. 1, 196 (1853)).

One such application of this principle occurs where a party seeks to enforce an agreement where its performance is dependent upon the enforcing party securing a license. Restatement (Second) of Contracts ("Restatement") § 181, cmt. a (1981). The general rule has been articulated as follows:

> If a party is prohibited from doing an act because of his failure to comply with a licensing, registration or similar requirement, a promise in consideration of his doing that act or of his promise to do it is unenforceable on grounds of public policy if
>
> > (a) the requirement has a regulatory purpose, and
>
> > (b) the interest in the enforcement of the promise is clearly outweighed by the public policy behind the requirement.

Restatement § 181. We have applied this rule in cases by prohibiting an individual from enforcing a contract seeking money damages against another party to the contract, where a

license was required for the performance of the contract and where we have determined that the license was necessary for the protection of the public. *Harry Berenter, Inc. v. Berman*, 258 Md. 290, 293 (1970) ("*Berenter*"); *Thorpe v. Carte*, 252 Md. 523, 529 (1969); *Smirlock v. Potomac Dev. Corp.*, 235 Md. 195, 203 (1964); *Snodgrass v. Immler*, 232 Md. 416, 421–22 (1963); *Goldsmith v. Mrfs. Liability Ins. Co.*, 132 Md. 283, 286 (1918).

In *Goldsmith*, an unlicensed insurance broker filed suit against a company to recover compensation, in the form of commissions, for services that the broker had performed which required a broker's license. 132 Md. at 284. This Court held that the unlicensed brokers could not recover compensation for their unlicensed services. We pointed out that under common law contractual principles, "[i]t is settled that, where the contract which the plaintiff seeks to enforce is expressly, or by implication, forbidden by the statute, no court will lend its assistance to give it effect." *Id.* at 286. We explained that where the statute is enacted "not for revenue alone, but to protect the public," the Court will not permit the contract's enforcement. *Id*. at 288.

In *Snodgrass*, we refused to permit an unlicensed architect to recover fees as a third-party beneficiary to a contract, where the underlying services performed by the architect required a license. 232 Md. at 416. Citing *Goldsmith*, we observed that the statute in question that required professional licensure was enacted for the protection of the public and not as a revenue measure. *Id.* at 422. Accordingly, we determined that "under the rule of the *Goldsmith* case, a contract prohibited by statute would not be enforceable by the unlicensed party[]" and therefore, the unlicensed architect was barred from recovery for his professional services. *Id.*

We applied the common law principle once again in *Smirlock*, 235 Md. 195, where we held that a real estate broker could not recover his broker's commission when he was not licensed in Maryland. We once again turned to our analysis in *Goldsmith* and *Snodgrass*, and applied the same common law principles, stating that

> [a] contract entered into by an unlicensed person, engaged in a trade, business or profession required to be licensed, and made in the course of such trade, business, or profession, cannot be enforced by such person, if it appears that the license required by the statute is, in whole or in part, for the protection of the public, and to prevent improper persons from engaging in such trade, business, or profession.

*Smirlock*, 235 Md. at 203 (internal quotations omitted).

In *Berenter*, we held that a building contractor could not enforce a mechanic's lien upon a property for $12,976.54 plus interest, where the contractor was not licensed under the Maryland Home Improvement Law and where the property owners were dissatisfied with the work and embroiled in a payment dispute. 258 Md. at 292. We once again cited to *Snodgrass* and *Goldsmith*, and noted that

> [w]e, and our predecessors have held that if a statute requiring a license for conducting a trade, business or profession is regulatory in nature for the protection of the public, rather than merely to raise revenue, an unlicensed person will not be given the assistance of the courts in enforcing contracts within the provisions of the regulatory statute because such enforcement is against public policy.

*Id*. at 293.

This takes us to *McDaniel*, where we applied these principles in the context of an unlicensed landlord who initiated a summary ejectment action against a tenant for failure to pay rent.

39

*3. This Court's Application of the Common Law Exception in the Context of an Unlicensed Landlord Seeking to Recover Rent and Repossession of Property Through the Summary Ejectment Statute*

In *McDaniel*, the landlord and tenant entered a written lease for an apartment rental in Anne Arundel County in March 2009. 419 Md. 560. Unbeknownst to the tenant, the landlord did not have a rental license as required by the Anne Arundel County Code. *Id.* at 564. Prior to moving into the apartment, the tenant paid the landlord the first month's rent, as well as a security deposit. *Id.* at 565. Immediately upon taking possession, the tenant discovered various problems with the apartment, including an electrical problem with the fuse box, which caused it to sizzle and spark and resulted in the power shutting off "quite a few times" per day. *Id.* According to the tenant, other aspects of the apartment were in disrepair, including two windows that had fallen out of the frames, hitting the tenant and her young daughter on the head on separate occasions. *Id*. at 566. In addition, the kitchen windows were missing locks, and the kitchen countertop was loose, and unglued to the cabinet on which it sat. *Id.*

The tenant contacted the county health department about the condition of the property, which resulted in a county inspection of the premises. The inspector issued a letter to the landlord in April 2009—within one month of the tenant moving in—notifying the landlord of numerous code violations involving the poor condition of the windows, kitchen countertop, and electrical system. *Id.* Throughout all of this, the tenant did not pay rent, other than her initial payment to cover the first month's rent and the security deposit. *Id.* at 567.

Thereafter, the landlord filed a summary ejectment action under RP § 8-401 for failure to pay rent due in April. *Id.* The District Court entered judgment for the landlord for the unpaid rent and awarded possession to the tenant. *Id.* The tenant filed a motion to revise the judgment, and the landlord filed a second summary ejectment action for the tenant's failure to pay May's rent. *Id.* at 568. Prior to the tenant's scheduled eviction, the tenant filed a notice of intention to defend and a counterclaim in the second summary ejectment action. *Id.*

At the hearing, the court denied the tenant's motion to revise the April judgment, denied her counterclaims, and entered judgment in favor of the landlord for possession of the property, as well as for the May rent and late fees, determining that the landlord's failure to obtain a license did not preclude his summary ejectment action and that the tenant had failed to prove actual injury under the MCPA. *Id.* After the circuit court affirmed the District Court judgment, we granted the tenant's petition for writ of *certiorari* to determine whether a landlord, who does not possess a rental license mandated by the county code, may nevertheless initiate summary ejectment proceedings based upon a tenant's failure to pay rent. *Id.* at 574.

We started our discussion by noting that "[t]he legal relationship between landlord and tenant is governed by the contract between the parties," as well as the statutory provisions related to landlords and tenants found in Title 8 of the Real Property Article. *Id.* We described the steps outlined in the summary ejectment statute, RP § 8-401, that enable a landlord to regain possession upon a tenant's failure to pay rent, noting the swiftness of the process. We observed that, although the summary ejectment process did

41

not require compliance with a county's license laws, we focused on the contractual nature of the parties' relationship. *Id.* at 579–80.

We analogized an unlicensed landlord's attempt to enforce his contract rights through the summary ejectment process to the unlicensed contractor in *Berenter* who was attempting to enforce his contractual right to payment through the mechanic's lien process. *Id.* at 583. Citing *Berenter*, we observed that "if a statute require[s] a license for conducting a trade or business[,]" which is "'regulatory in nature for the protection of the public, rather than merely to raise revenue,' a person who has neglected to obtain a license 'will not be given the assistance of the courts' in enforcing the contract." *Id.* "In other words," we explained, "once we determined that the purpose of the statute was to eliminate a perceived harm, rather than to build the public fisc, then we recognized that an unlicensed person should not be afforded the benefit of swift justice, or the establishment of a mechanic's lien, which requires but a filing in court for its creation." *Id.*[18]

We also noted that a summary ejectment proceeding under RP § 8-401 is "substantively and procedurally limited," thereby precluding the litigation of complex issues. *Id.* at 585. We observed that "[l]icensure under local ordinances in order to operate rental dwelling units is an integral part of a landlord's status as claimant in those jurisdictions that require licensure." *Id.* at 587. We held that, "in order to invoke the facile process of summary ejectment, a landlord in those jurisdictions requiring licensure, must

---

[18] In addition to our reliance upon *Berenter*, we noted that we previously "determined that the failure to obtain a license precluded the enforcement of a contract in proceedings regarded as other than 'summary' in nature." *McDaniel*, 419 Md. 560 n.21 (citing *Snodgrass*, 232 Md. 416 (1963)).

affirmatively plead and demonstrate that he is licensed at the time of the filing of the complaint for summary ejectment in order to initiate the summary ejectment process." *Id*. In other words, we concluded, based upon the common law principles expressed in the Restatement § 181, that we would not permit an unlicensed landlord to enforce the landlord's contractual right to receive rent within the summary ejectment process. Our holding in *McDaniel* was based upon two controlling factors: (1) the public policy principle that courts will not permit an unlicensed contractor to enforce a contract, the performance of which is dependent upon a license issued for the protection of the public; and (2) the swift nature of the summary ejectment proceeding, which would entitle an unlicensed claimant to contractual relief in the form of money damages and possession of property arising from a tenant's alleged breach of contract.[19]

4. *Our Decision to Apply the Common-Law Principles of McDaniel to All Collection Efforts that Relate Back to the Unlicensed Period*

Of course, the difference between *McDaniel* and the question certified here relates to the *timing* of the landlord's efforts to collect unpaid rent that is attributable to the unlicensed period—a question that has not previously been presented to this Court. In

---

[19] In the 2022 Legislative Session, the General Assembly enacted Senate Bill 563, which attempted to codify our holding in *McDaniel*, and extend it not only to summary ejectment proceedings, but also to tenant holding over proceedings, filed under RP § 8-402, and breach of lease proceedings filed under RP § 8-402.1. *See* S.B. 563, 2022 Leg., Reg. Sess. (Md. 2022). After the Session concluded, on May 27, 2022, Governor Hogan vetoed the Bill. To date, this veto has not been overridden and because this is an election year, Senate Bill 563 can only be considered for a veto override if the General Assembly convenes a special session prior to a new General Assembly being sworn in on the first day of the next legislative session, which is set for January 11, 2023. *See* Md. Const. art. II, § 17(d) (stating: "No [] vetoed Bill shall be returned to the Legislature when a new General Assembly of Maryland has been elected and sworn since the passage of the vetoed Bill.").

43

*McDaniel*, this Court unanimously determined to apply the common law principles expressed in the Restatement § 181 to preclude an unlicensed landlord from contemporaneously filing a summary ejectment proceeding to enforce his contractual right to collect rent attributable to the unlicensed period.

In the 11 years since *McDaniel* was decided, unlicensed landlords have been precluded from initiating summary ejectment proceedings under § RP 8-401 when a tenant fails to pay rent. With the issue presented squarely before us, we determine that there is no reason for this Court to draw a distinction between an unlicensed landlord who is *currently* attempting to collect rent through a summary ejectment proceeding for unpaid rent attributable to the unlicensed period on the one hand, and a landlord who *later* obtains a license and files a summary ejectment proceeding to collect unpaid rent attributable to the *same unlicensed period*.[20] In other words, in both instances, the landlord is attempting to collect rent that is attributable to the period when the property was unlicensed.

---

[20] The Dissent mischaracterizes our holding in this case as "effectively overrul[ing]" *McDaniel*. Dissent Op. at 14. We disagree. The issue in *McDaniel* was whether a landlord "who has failed to obtain a [rental] license," as mandated by the county code, "may nevertheless initiate summary ejectment proceedings for a tenant's failure to pay rent, pursuant to [RP §] 8-401." *McDaniel*, 419 Md. at 563. We held that a "a landlord in those jurisdictions requiring licensure, must affirmatively plead and demonstrate that he is licensed at the time of the filing of the complaint for summary ejectment in in order to initiate the summary ejectment process." *Id.* at 587. We did *not* address the issue that arises in connection with the certified question here—whether the landlord, having acquired a license, may initiate a summary ejectment proceeding to collect rent attributable to the same unlicensed period. That issue was not presented in *McDaniel*. We address it now.

The Dissent also points out that in the *McDaniel* mandate, it "appears that we affirmed the landlord's monetary judgment." Dissent Op. at 5–6. To be sure, although the mandate in that case is confusing, and although we agree with the Dissent that it "appears" that we affirmed the landlord's monetary judgment, there was zero discussion whatsoever on that

44

Applying the principles outlined in the Restatement § 181 that we applied in *McDaniel*, as well as in the above-described cases (*Berenter*, *Thorpe*, *Smirlock*, *Snodgrass*, and *Goldsmith*), dating back over 100 years, we note that the rental license requirements have a regulatory purpose—ensuring safe and habitable rental housing. Where a jurisdiction has a rental license requirement in place, the landlord's ability to perform a contract is conditioned upon the landlord having a license. We also determine that the landlord's interest in collecting unpaid rent that would have been owed during the period when the residential unit was unlicensed is outweighed by the public benefit of ensuring that landlords comply with their licensing obligations, which ensure safe and habitable housing conditions. We also conclude that our holding expressed herein should apply to all claims by a landlord against a tenant who attempts to collect unpaid rent attributable to the unlicensed period— whether they arise under the remedies provided by the General Assembly under Title 8 of the Real Property Article or under a common law action for breach of contract based upon a

---

issue. Moreover, we also note that the landlord had prevailed on a breach of contract claim that was not addressed by this Court because it had not been raised. *See McDaniel*, 419 Md. at n.7 ("We do not address the effect of the lack of license on a breach of contract claim brought by the landlord, because the issue was not raised in the Petition for Certiorari."). Indeed, the vague language contained in the mandate concerning the monetary judgment in favor of the landlord may have referred to the landlord's breach of contract claim, which was not considered by this Court. Regardless, we will not interpret the language of the mandate as establishing an affirmative holding by this Court that a previously unlicensed landlord may subsequently acquire a license and initiate a summary ejectment proceeding to collect rent attributable to the period when the landlord lacked the license.

tenant's failure to pay rent.[21]  In other words, the public policy consideration is the same regardless of the judicial forum in which the collection is brought.

Accordingly, based upon our authority to apply the common law principles expressed in the Restatement § 181, we hold as follows:

Where a municipality or county enacts a rental license law which conditions the performance of a residential lease upon the issuance of a rental license, and a landlord fails to possess a valid license for a period of a tenant's occupancy, a landlord may not utilize the courts, whether through a common law breach of contract action, or a statutory right of action filed under Title 8 of the Real Property Article to recover unpaid rent that is attributable to an unlicensed period.  This prohibition shall not apply where the landlord can demonstrate that the wrongful actions of the tenant caused the licensing authority to suspend, revoke, or refuse to grant or renew the rental license.

The above holding, when read with our holding in *McDaniel*, precludes a landlord from collecting rent attributable to an unlicensed period unless the tenant's actions caused

---

[21] To limit the application of *McDaniel* only to the current collection efforts of an unlicensed landlord would create negative consequences for tenants living in unlicensed units.  The landlord could delay his efforts to obtain licensure, thereby enabling unpaid rent to accumulate.  When the license is ultimately obtained, the landlord could then sue for back-rent and possession based upon the tenant's failure to pay rent during the period when the landlord was required to be licensed.  With the accumulation of unpaid rent during the unlicensed period, we can imagine circumstances where the landlord could obtain a considerable monetary judgment and an order for possession.  There is a symmetry to our holdings—a tenant who voluntarily pays rent during an unlicensed period is not entitled to a punitive remedy of restitution or disgorgement of rent under the MCPA based upon a lack of licensure alone.  On the other hand, a landlord may not engage in collection activities against a tenant to collect unpaid rent attributable to a period when the landlord was required to be licensed to engage in such activities.

46

the lack or lapse of licensure. Our holdings on these questions are not dependent on the specific language § 5-4(a)(2)—they are based on this Court's authority to apply the common law as it pertains to private rights of action.

Turning to the precise issue presented in question 2, with our above holding that a landlord may not engage in collection activities or pursue claims against a tenant who has failed to pay rent during a period when the landlord was unlicensed, a tenant may have a right of action under the MCDCA and the MCPA where the landlord engages in such activity, and the tenant can establish that the unlawful conduct caused damages. Stated another way, because we hold that the landlord does not have a right to file a summary ejectment proceeding to collect unpaid rent that was attributable to an unlicensed period, if the landlord undertakes such action, the landlord could violate the MCDCA. *See, e.g.*, CL §14-202(8) (stating that an alleged debt collector may not "claim, attempt, or threaten to enforce a right with knowledge that the right does not exist."). A violation of the MCDCA constitutes a violation of the MCPA. *See* CL § 13-301(14)(iii) (stating that an unfair, abusive or deceptive trade practice includes any violation of the MCDCA). If the landlord undertakes debt collection activities to collect unpaid rent—which are prohibited under this Court's holding in this case—rent paid in response to the landlord's collection activities may constitute damages.

## III

### Conclusion

In connection with our answer to the certified questions presented herein, we hold as follows:

A.     A tenant who voluntarily paid rent to a landlord who lacked a rental license required by the Baltimore City Code may not maintain a private action under the MCPA to recover restitution of rent based on the lack of licensure alone.  Our case law firmly establishes that a tenant may only bring a private action under the MCPA for unfair, abusive, or deceptive trade practices arising from renting an unlicensed dwelling if the tenant can prove that the unlicensed condition caused them to suffer an "actual injury or loss." *See CitaraManis*, 328 Md. at 151; *Galola*, 328 Md. at 185–86; *McDaniel*, 419 Md. at 588.

B.     The Baltimore City Council, in enacting Bill 18-0185, which added § 5-4(a)(2) to the Baltimore City Code, did not intend to create a judicial remedy enabling City tenants to seek restitution of rent as part of a private action filed under the MCPA.

C.     Even if the Baltimore City Council had intended to create a judicial remedy of restitution in connection with a private action under the MCPA, the City Council lacks the authority to adopt a local law that modifies the remedies established by the MCPA—a state statute that provides uniform remedies to consumers on a state-wide basis who are subject to unfair, abusive, or deceptive trade practices.

D.     In *McDaniel*, 419 Md. 560, this Court applied the common law principles expressed in the Restatement § 181 to preclude an unlicensed landlord from utilizing the summary ejectment proceeding to enforce the landlord's contractual right to collect rent during a period when the landlord did not have a license to engage in rental activity.  We determine that there is no reason to draw a distinction between the circumstance under which an unlicensed landlord is contemporaneously attempting to enforce a contractual obligation to pay rent that is attributable to an unlicensed period, and the circumstance

48

where the landlord *later* obtains a license but is seeking to retroactively collect unpaid rent attributable to the unlicensed period. Accordingly, based upon our authority to apply the common law principles expressed in the Restatement § 181, we hold:

Where a municipality or county enacts a rental license law, which conditions the performance of a residential lease upon the issuance of a rental license, and a landlord fails to possess a valid license for a period of a tenant's occupancy, a landlord may not utilize the courts, whether through a common law breach of contract action, or a statutory action arising under Title 8 of the Real Property Article to recover unpaid rent that is attributable to the unlicensed period. This prohibition shall not apply where the landlord can demonstrate that the wrongful actions of the tenant caused the licensing authority to suspend, revoke, or refuse to grant or renew the rental license.

E.      Given our holding that a landlord may not engage in debt collection activities or pursue claims against a tenant who has failed to pay rent attributable to a period during which the landlord was unlicensed, a tenant may have a right of action under the MCDCA and the MCPA where the landlord engages in such activity, and the tenant can establish that the unlawful conduct caused damages.

**CERTIFIED QUESTIONS OF LAW ANSWERED AS SET FORTH ABOVE. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**

United States District Court
for the District of Maryland
Case No. 20-02376-CCB
Argued: March 4, 2022

IN THE COURT OF APPEALS

OF MARYLAND

Misc. No. 11

September Term, 2021

_____

ALISON ASSANAH-CARROLL

v.

LAW OFFICES OF EDWARD J. MAHER,
P.C., ET AL.

_____

*Getty, C.J.
Watts
Hotten
Booth
Biran
Gould
McDonald, Robert N. (Senior
Judge, Specially Assigned)

JJ.

_____

Concurring and Dissenting Opinion by Watts, J.

_____

Filed: July 28, 2022

*Getty, C.J., now a Senior Judge, participated in
the hearing and conference of this case while an
active member of this Court. After being
recalled pursuant to Md. Const., Art. IV, § 3A,
he also participated in the decision and adoption
of this opinion.

Respectfully, I concur in part and dissent in part. I join the Majority's decision to answer the second certified question of law "yes." See Maj. Op. at 2-3. But, I would also answer the first certified question of law "yes" and hold that, in an action under the Maryland Consumer Debt Collection Act ("the MCDCA"), Md. Code Ann., Comm. Law (1975, 2013 Repl. Vol.) ("CL") §§ 14-201 to 14-204, and the Maryland Consumer Protection Act ("the MCPA"), CL §§ 13-101 to 13-501, a tenant can recover rent collected by an unlicensed landlord in violation of Baltimore City Code ("BCC"), Art. 13, § 5-4(a)(2). The tenant need not show that the tenant was injured due to the condition of the rental dwelling because the injury is being forced to pay rent illegally. In other words, I would hold that a tenant forced to pay rent illegally to an unlicensed landlord suffers an actual injury or loss.

The plain language of the relevant provisions within BCC, Art. 13, § 5-4, the MCDCA, and the MCPA warrants this result. BCC, Art. 13, § 5-4(a)(2) unambiguously states that an unlicensed landlord may not "charge, accept, retain, or seek to collect any rental payment[.]" It is a violation of the MCDCA, and by extension the MCPA, to claim, attempt, or threaten to enforce a right with knowledge that the right does not exist. See CL §§ 14-202(8), 13-301(14)(iii). It is also a violation of the MCPA to deceive a consumer by making a misleading representation or by failing to state a material fact. See CL § 13-301(1), (3). A consumer is eligible for "damages proximately caused by [a] violation" of the MCDCA and damages "for injury or loss sustained [] as a result of" a violation of the MCPA. CL §§ 14-203, 13-408(a).

Where an unlicensed landlord collects rent in violation of BCC, Art. 13, § 5-4(a)(2)

by collecting rent while unlicensed and the landlord is aware, *i.e.*, has knowledge, that no right to charge rent exists, the landlord has violated the MCDCA and the MCPA. The landlord has committed an additional violation of the MCPA if the landlord has deceived the tenant into believing that the landlord was licensed. The rent collected in violation of BCC, Art. 13, § 5-4(a)(2) constitutes damages under both the MCDCA and the MCPA because the landlord's illegal collection of the rent caused the tenant to be deprived of money that, by law, the tenant did not owe.[1]

The prohibition on an unlicensed landlord collecting rent under BCC, Art. 13, § 5-4(a)(2) satisfies the requirement discussed in CitaraManis and its progeny that, to prevail under the MCPA, a tenant must show actual loss or injury independent of a failure by a landlord to comply with a licensing requirement. See CitaraManis v. Hallowell, 328 Md. 142, 157-58, 613 A.2d 964, 971 (1992);[2] Galola v. Snyder, 328 Md. 182, 185-86, 613 A.2d

---

[1]In the 2022 Legislative Session, the General Assembly enacted Senate Bill 563, requiring that a landlord plead and demonstrate compliance with local licensure requirements when filing a complaint to repossess residential property, either as a summary ejectment action, a tenant holding over action, or a breach of lease action. See S.B. 563 2022 Leg. Reg. Sess. (Md. 2022). After the 2022 Legislative Session ended, the Governor vetoed Senate Bill 563. To override the veto, the General Assembly would need to convene a special legislative session prior to a new General Assembly being sworn in at the start of the next legislative session. See Md. Const., Art. II, § 17(d). In addition, the new General Assembly could, in the 2023 Legislative Session, simply enact the same legislation as that contained in Senate Bill 563. The fact that the General Assembly enacted Senate Bill 563, despite the Governor's later veto, is indicative of an intent that landlords be licensed to pursue actions to repossess residential property and supports the principle that rent would constitute damages under the MCDCA and the MCPA.

[2]In Golt v. Phillips, 308 Md. 1, 12-14, 517 A.2d 328, 333-34 (1986), we held that, under the MCPA, a tenant could recover rent paid to an unlicensed landlord. In CitaraManis, 328 Md. at 164, 613 A.2d at 974, we indicated that our holding in Golt was based on the circumstance that the premises were uninhabitable in that case.

983, 985 (1992); McDaniel v. Baranowski, 419 Md. 560, 587-88, 19 A.3d 927, 943 (2011). In CitaraManis, the ordinance at issue stated that "[n]o building or structure, or part thereof, shall be leased, rented or let or subleased, subrented or sublet without first obtaining a rental housing license from the department of public works and paying the requisite fee or charge therefor." CitaraManis, 328 Md. at 145 n.1, 613 A.2d at 965 n.1. In Galola, the action originated in the District Court of Maryland, sitting in Howard County, and citing CitaraManis, this Court reached the conclusion that "[a] tenant is not entitled to damages under § 13-408(a) of the CPA solely upon proof that the leased property was not licensed as required by law; rather, the tenant must prove actual loss or injury caused by the lack of licensure." Galola, 328 Md. at 185-86, 613 A.2d at 985. Like in CitaraManis, in Galola, there was no discussion whatsoever of any statutory provision that explicitly made the collection of rent unlawful. In McDaniel, similar to the provision at issue in CitaraManis, the ordinance provided that "[a] person may not operate a multiple dwelling or rooming house without a license issued by the Department. A separate license is required for each multiple dwelling or rooming house." McDaniel, 419 Md. at 562 n.2, 19 A.3d at 928 n.2. Unlike the ordinances discussed above, BCC, Art. 13, § 5-4(a)(2) unequivocally prohibits charging, accepting, retaining, or seeking to collect any rental payment or other compensation unless the landlord is licensed under Subtitle 5 of Article 13 of the BCC. This is not meaningless language. As a result of the prohibition set forth in BCC, Art. 13, § 5-4(a)(2), an unlicensed landlord causes a tenant actual loss or injury by collecting rent in violation of BCC, Art. 13, § 5-4(a)(2).

I am unpersuaded by Appellees' contention that BCC, Art. 13, § 5-4(a) is

substantively identical to the ordinances at issue in <u>CitaraManis</u> and related cases because, according to Appellees, BCC, Art. 13, § 5-4(a)(2) merely identifies specific actions (such as collecting or charging rent) that fall under the general category of operating a rental dwelling, which an unlicensed landlord is already prohibited from doing under BCC, Art. 13, § 5-4(a)(1).  In an attempt to assert that BCC, Art. 13, § 5-4(a)(1) has no independent meaning, Appellees seek to lump BCC, Art. 13, § 5-4(a)(1) and (a)(2) together to mean that both simply set forth a licensing requirement—a violation of which, without more, is not a basis for recovery under the MCPA or the MCDCA.

The problem with this reasoning is that it would render BCC, Art. 13, § 5-4(a)(2) pointless and violate the principle that a court must read a statute or ordinance as a whole so that no part of it is rendered meaningless.  <u>See</u> <u>Wheeling v. Selene Fin. LP</u>, 473 Md. 356, 376, 250 A.3d 197, 209 (2021).  This principle of statutory construction is particularly applicable in determining whether a violation of BCC, Art. 13, § 5-4(a)(2) results in loss or injury given that the Baltimore City Council did not create the licensing requirement and the prohibition on an unlicensed landlord collecting rent at the same time.

Baltimore City has had a licensing requirement for landlords for decades.  <u>See</u> <u>Golt v. Phillips</u>, 308 Md. 1, 13, 517 A.2d 328, 334 (1986).  It was not until 2018 that, by enacting BCC, Art. 13, § 5-4(a)(2), the Baltimore City Council established the prohibition that an unlicensed landlord may not collect or charge rent.  <u>See</u> Balt. City Council, Council Bill 18-0185 at 9, <u>available at</u> https://dhcd.baltimorecity.gov/sites/default/files/Full_text_of_ Council_Bill_18-0185.pdf      [https://perma.cc/MH9S-8H84].      Under      Appellees' interpretation, the 2018 enactment of BCC, Art. 13, § 5-4(a)(2) would have been

- 4 -

meaningless because it would have simply added a statutory paragraph prohibiting actions that were already unlawful for an unlicensed landlord to take. For the 2018 legislation, *i.e.*, the enactment of BCC, Art. 13, § 5-4(a)(2), to have any significance, it must do more than state what was already required of a landlord. With certainty, that is the case because BCC, Art. 13, § 5-4(a)(2) changed the law by, for the first time, prohibiting an unlicensed landlord from collecting rent. It is clear that BCC, Art. 13, § 5-4(a) is not substantively identical to the ordinances at issue in CitaraManis and its progeny, which lacked such a prohibition.

Equally unpersuasive is Appellees' argument that, if the collection of rent by an unlicensed landlord was not prohibited until the Baltimore City enacted BCC, Art. 13, § 5-4(a)(2) in 2018, the licensing requirement would have been meaningless up to that point. The BCC provides for enforcement mechanisms in BCC, Art. 13, § 5-25, titled "Enforcement by citation," and BCC, Art. 13, § 5-26, titled "Penalties." BCC, Art. 13, § 5-25(a) states that Subtitle 5 may be enforced by issuance of an environmental citation "[i]n addition to any other civil or criminal remedy or enforcement procedure[.]" With the 2018 enactment of BCC, Art. 13, § 5-4(a)(2), the Baltimore City Council created an express prohibition on an unlicensed landlord collecting rent, which, read together with the language of BCC, Art. 13, § 5-25, may be enforced by a civil remedy in addition to the public enforcement procedures that were already available and adds another incentive for landlords to become licensed.

Appellees' assertion that the purpose of the 2018 enactment of BCC, Art. 13, § 5-4(a)(2) was to give examples of what an unlicensed landlord cannot do because the

licensing requirement was going to "apply to a new set of landlords" is also unpersuasive. Appellees are apparently referring to the circumstance that, in 2018, the Baltimore City Council made the licensing requirement, which had applied only to rental properties with at least three dwelling units, also apply to one- and two-family rental dwellings. See Balt. City Council, Council Bill 18-0185 at 1. Appellees' position appears to be that the Baltimore City Council enacted BCC, Art. 13, § 5-4(a)(2) to provide a list of actions that an unlicensed landlord cannot take so that the ramifications of the licensing requirement would be clear to landlords who previously were not subject to the requirement. This is based on the premise that the Baltimore City Council believed that before the enactment of BCC, Art. 13, § 5-4(a)(2), landlords with rental properties of at least three dwellings somehow understood that they were not able to collect or charge rent but landlords with rental properties of one to two unit would be incapable of such an understanding. Simply put, that is illogical. Adoption of Appellees' theory would plainly render the 2018 legislation enacting BCC, Art. 13, § 5-4(a)(2) meaningless.

Also without basis is Appellees' contention that, unless this Court interprets BCC, Art. 13, § 5-4(a)(2) as they propose, the provision would result in an unconstitutional taking and an unconstitutional interference with vested property and contract rights. Appellant points out, though, that BCC, Art. 13, § 5-4(a)(2) does not result in an unconstitutional taking because the license requirement is not the functional equivalent of a direct appropriation of properties, or an ouster of landlords from properties. In my view, BCC, Art. 13, § 5-4(a)(2) does not unconstitutionally interfere with vested property and contract rights because there is no right to keep rent collected illegally.

- 6 -

In sum, I would conclude that where an unlicensed landlord collects rent in violation of BCC, Art. 13, § 5-4(a)(2), a tenant suffers an actual loss or injury compensable under the MCDCA and the MCPA.  This conclusion gives effect to the General Assembly's intent to protect consumers and the Baltimore City Council's intent to protect tenants.  Collecting rent without a license is prohibited, *i.e.*, unlawful, in Baltimore City, and allowing an action to be brought under the MCDCA or the MCPA would constitute a valid avenue for a tenant harmed by being unlawfully required to pay rent to obtain relief from the injury.

For the above reasons, respectfully, I concur in part and dissent in part.

United States District Court
for the District of Maryland
Case No. 20-02376-CCB
Argued: March 4, 2022

IN THE COURT OF APPEALS

OF MARYLAND

Misc. No. 11

September Term, 2021
_____

ALISON ASSANAH-CARROLL

v.

LAW OFFICES OF EDWARD J. MAHER,
P.C., ET AL.
_____

*Getty, C.J.
Watts
Hotten
Booth
Biran
Gould
McDonald, Robert N. (Senior
Judge, Specially Assigned)

JJ.
_____

Concurring and Dissenting Opinion by Gould,
J., which Getty, C.J., joins.

_____

Filed: July 28, 2022

*Getty, C.J., now a Senior Judge, participated in
the hearing and conference of this case while an
active member of this Court. After being
recalled pursuant to Md. Const., Art. IV, § 3A,
he also participated in the decision and adoption
of this opinion.

I respectfully concur in part and dissent in part. I concur with and join the Majority's analysis and response to certified question 1. For the following reasons, however, I dissent to the Majority's analysis and answer to certified question 2.

At common law, tenants were required to pay rent regardless of the condition of the property. The rent escrow statute was designed in part to ameliorate the harsh consequences of that rule for tenants living in rental housing with dangerous conditions that the landlord failed to fix. The statute preserves the duty of the tenant to pay rent, but empowers the court to, among other things, redirect those payments to the court's registry to compel the landlord to fix the defects or provide the funds necessary for someone else to do so. The statute strikes a balance between the competing interests of property owners and their tenants, and largely leaves intact the existing common law principles imposed on both parties.

The licensing requirements for rental units imposed by Baltimore City and other counties in this State are designed to help ensure that property owners provide habitable and safe housing. The key word is "help." A rental property can, at the same time, be both unlicensed and in perfect condition. A rental property can also be licensed and, at some point during the licensing period, uninhabitable. The licensing requirements of local governments at least ensure that the rental unit is safe and habitable at a snapshot in time—the day the license issued.

Up until today, our caselaw on the consequences of the landlord's failure to get or maintain the required rental license has been consistent with both traditional common law principles as well as the policy choices of the General Assembly in balancing the interests

of property owners and tenants.  That is, our caselaw has steered clear of adopting a rule of forfeiture for unlicensed properties and instead has focused on the condition of the property and the extent to which the tenant received the benefit of the bargain.  Under that caselaw, the lack of a license alone was not enough to relieve a tenant of the common law duty to pay rent or strip the owner of its right to receive rent.  So, if you lived in a luxury apartment building with 100 units, and the building was delayed in getting the license renewed because of a defect in one of the other units, under our caselaw, you still had to pay your rent; you were not entitled to a windfall.

Today, the Majority adopts a rule of forfeiture based solely on the lack of a rental license, that is without regard to the condition of the property.  So now, in the example above, you would enjoy the windfall of living rent-free until the building's license is renewed, even though your unit is in perfect condition.  The only exception to this new rule is if the tenant voluntarily paid rent during that period—out of naivety or a lack of information—then the owner is entitled to keep it.  As to rental properties with no defects, this new rule abrogates the common law and, unlike the rent escrow statute, exalts form over substance. In my view, the Majority reaches this incorrect result through a misunderstanding of the principles established in our prior caselaw and a misapplication of the cases involving occupational licensing requirements.

## DISCUSSION

Today, the Majority announces a new principle of law:

> Where a municipality or county enacts a rental license law which conditions the performance of a residential lease upon the issuance of a rental license, and a landlord fails to possess a valid license for a period of a tenant's

2

occupancy, a landlord may not utilize the courts, whether through a common law breach of contract action, or a statutory right of action filed under Title 8 of the Real Property Article to recover unpaid rent that is attributable to an unlicensed period.

Op. at 46-47.

It is important to understand the implications of this holding. In *CitaraManis v. Hallowell*, where there was no issue regarding the condition of the rental property, we held that if your *only* complaint about your rental unit was that the landlord did not secure the requisite license, you were not entitled to reimbursement of your rental payments under the Maryland Consumer Protection Act or under a theory of restitution. 328 Md. 142 (1992). Thus, the money remained in the landlord's pocket. A contrary result, we held, would be punitive. *Id*. at 153-54.

Under today's decision, however, the law puts you in a different position if you withhold your rental payment. That is, even if you have no complaint about the condition of the rental property, you are entitled to live rent-free for the entire period that the property was not licensed. And if the landlord takes action to collect back rent from you, under the Majority's answer to certified question 2, you have an iron-clad defense. Thus, if you are savvy enough to hold back your rent, the money will remain in your pocket, notwithstanding the same punitive consequence to the landlord that compelled the opposite conclusion in the example above.

So how does the Majority justify what, in my view, is an illogical asymmetry?[1] Various state and local laws impose a license requirement on those who seek to engage in

---

[1] The Majority sees a different symmetry, with which I disagree, as discussed below.

3

certain occupations. Examples include architects, home improvement contractors, real estate agents, life insurance agents, plumbers, and other construction trades. Sometimes, individuals or companies will provide such services without obtaining the requisite license. Not surprisingly, a body of caselaw has emerged that addresses an unlicensed professional's entitlement to compensation for services rendered. These are the cases on which the Majority relies in reaching its holding today. Those cases, which for ease of reference, I will refer to as the "unlicensed occupation cases," include:

- *Harry Berenter, Inc. v. Berman*, 258 Md. 290, 291 (1970), in which an unlicensed contractor attempted to enforce a mechanic's lien;
- *Thorpe v. Carte*, 252 Md. 523, 525-26 (1969) and *Smirlock v. Potomac Development Corp.*, 235 Md. 195, 196-97 (1964), in which unlicensed real estate brokers sought to recover sales commissions under breach of contract actions;
- *Snodgrass v. Immler*, 232 Md. 416, 418 (1963), in which an unlicensed architect sought to recover as a third-party beneficiary under a services contract; and
- *Goldsmith v. Manufacturers' Liability Insurance Co. of New Jersey*, 132 Md. 283, 286 (1918), in which unlicensed insurance brokers sought to recover placement commissions under a breach of contract action.

In each of these cases, because the license requirement existed to protect the public, we determined that the failure of the professional to obtain the license rendered their contracts illegal and unenforceable. *Harry Berenter*, 258 Md. at 298-99; *Thorpe*, 252 Md. at 530; *Smirlock*, 235 Md. at 203; *Snodgrass*, 232 Md. at 423-24; *Goldsmith*, 132 Md. at 288-89. Thus, the professionals' attempts to enforce their right to compensation were rejected.

According to the Majority, the principles established in these cases were applied by this Court in *McDaniel v. Baranowski*, 419 Md. 560, 587 (2011), where we held that the

4

owner of an unlicensed property could not utilize the summary ejectment procedure. Thus, as the Majority sees it, these same principles should apply to certified question 2 as a logical extension of *McDaniel*, to bar the owner from collecting back rent attributable to the unlicensed period, even if the owner secures the proper license.

The Majority's reasoning is, in my view, flawed in two respects. *First*, in *CitaraManis*, which was an appeal from summary judgment, we held under a virtually identical set of facts that the principles established in the unlicensed occupation cases— indeed the same cases on which the Majority relies today—did not apply. Thus, the Majority's unyielding reliance on the principles established in these cases is misplaced.

*Second*, in my view, the Majority incorrectly reads *McDaniel*. In *McDaniel*, where the landlord was using the summary ejectment action to collect back rent that accrued during the unlicensed period, we held that the owner had to be licensed at the time that the owner filed the summary ejectment action, and that it was required to allege that it was licensed at the time of filing. 419 Md. at 586-87. That—being licensed at the time of the court filing—was the only obstacle we found to the owner's summary ejectment action. And, in *McDaniel*, even though we vacated the judgment of possession that the landlord had secured through the summary ejectment proceedings, we affirmed the landlord's monetary judgment. *See id.* at 588. As I see it, *McDaniel* compels the opposite conclusion than that reached by the Majority.

**A**

Let's start with the factual similarities between this case and *CitaraManis*. In *CitaraManis*, the rental property was not licensed throughout the duration of the tenancy.

5

328 Md. at 145.  Similarly, Assanah-Carroll alleges that her tenancy spanned time periods in which the building's rental license had lapsed.  In *CitaraManis*, the tenants did not "allege that the house they rented was unclean, unsafe, uninhabitable or unsuitable in any regard."  *Id*. at 149.  Here, Assanah-Carroll "does not allege that her dwelling unit was uninhabitable or that the value of the lease was diminished by any condition of the property caused by the lack of licensure."  And in *CitaraManis*, the tenants claimed that the unlicensed status of the property relieved them of the duty to pay rent, and therefore they sought restitution of rent paid during the time in which the property was unlicensed.  *Id*. at 145.  Likewise, here, Assanah-Carroll argues that she was relieved of the duty to pay rent due to the unlicensed status of the property, which, for her, means that the landlord is precluded from taking any collection action for rent accrued during the unlicensed period, and she is entitled to restitution of any rent she paid during that period.

In *CitaraManis*, in support of their restitution claim, the tenants relied on the same line of unlicensed occupation cases as does the Majority here.  *Id.* at 158.  However, we *rejected* the tenants' application of those cases to their restitution claim for two reasons.  Although the second is more relevant here, for the sake of completeness, I will discuss both in turn.[2]

---

[2] To correlate this discussion to our opinion in *CitaraManis*, the following may help. Our discussion of the restitution claim in *CitaraManis* is contained in Part IV of that opinion, which consists of one lengthy introductory paragraph and subparts A and B.  *See id.* at 158-64.  In the introductory paragraph and subpart A, we provide the first reason the unprofessional license cases do not apply, and we provide the second reason in subpart B.

*First*, the procedural posture of the unlicensed professional cases was materially different than the procedural posture in *CitaraManis*. In the unlicensed professional cases, the professional was suing the customer for breach of contract; in *CitaraManis*, the tenants were seeking restitution from the owner on a theory of unjust enrichment. *See id.* at 159. These are different causes of action with distinct elements. Based on the different elements of these two claims, the owner's failure to prevail in a breach of contract claim for unpaid rent does not automatically mean that the tenant succeeds in a restitution claim for rent voluntarily paid. And that's what we found on the undisputed facts in *CitaraManis*.

We reached that conclusion by first assuming *arguendo* that the rule of the unlicensed occupation cases *does* apply to the landlord, that is, we assumed that the landlord was *not* entitled to enforce the illegal lease. We then observed that on the undisputed facts, "the tenants have received everything that they bargained for[.]" 328 Md. at 159. Thus, we concluded, the tenants were unable to establish an essential element of their restitution claim—that the owner was unjustly enriched by the voluntary rent payments.[3] *Id.*

---

[3] Thus, respectfully, I believe the Majority misconstrues Part IV of the opinion where we said, "we need not decide whether lack of the required rental housing license, in and of itself and without regard to the condition of the premises, would be sufficient to bar a landlord's claim for unpaid rent or for use and occupation." *CitaraManis*, 328 Md. at 158-59. In my view, that sentence needs to be read in conjunction with the sentences that came immediately before and after. Referring to the unlicensed occupation cases, we stated:

> In cases of that type this Court has denied a recovery, either on an express contract theory or on the theory of *quantum meruit,* sought by one who rendered services for which payment has not yet been made. Here we

7

*Second*, we went ahead and decided the issue. We determined that on the undisputed

facts, the owner in *CitaraManis* was *not* subject to the rule established in the unlicensed

occupation cases. *Id.* at 162-63 (citing *Schloss v. Davis*, 213 Md. 119, 124 (1957)). We

began our analysis of the tenants' restitution claim recognizing that the "[u]nenforceability

of a contract because of illegality is a function of the strength of the public policy involved

together with the degree of the violation of that policy under the facts of the case." *Id*. at

158 (citing *Schloss*, 213 Md. at 124-25). We then concluded that "the facts of the instant

case on summary judgment do not present the degree of illegality that triggers application

of the rule of the unlicensed occupation cases." *Id*. at 162. We observed that the purpose

of the licensing requirement for rental properties was to identify the properties "to be

inspected in order to determine compliance with housing codes[,]" not to determine

"whether particular landlords or their agents have necessary qualifications to render

---

> need not decide whether lack of the required rental housing license, in and of itself and without regard to the condition of the premises, would be sufficient to bar a landlord's claim for unpaid rent or for use and occupation. It is conceivable that a case could arise in which the public policy is so strong and the degree of violation so great that one benefitted by services rendered by an unlicensed person would be permitted to recover monies paid for the services, but that is not the situation presented on this record.

*Id.*

In the second sentence in the above quote, we did not state or imply that we were leaving that question open for resolution on another day. Rather, that sentence was meant merely as a rhetorical device to set up our explanation in subpart A that the tenant's restitution claim failed even if we assumed that the owner of the property was subject to the same rule of forfeiture set forth in the unlicensed occupation cases.

In fact, we did not leave the question for another day. In subpart B, we expressly considered the issue and concluded that the lack of a license alone would *not* trigger application of the rule governing unlicensed professionals, as explained below.

8

services as landlords[.]" *Id.* We concluded that the facts of *CitaraManis* and *Golt v. Phillips*, 308 Md. 1 (1986), aligned *not* with the unlicensed occupation cases on which the tenants relied, but rather with *Schloss*, 213 Md. at 124, a case in which construction of the property began without the requisite building permit.

We explained that, in *Schloss*, the plaintiff was a construction manager seeking payment from the owner for compensation under an oral contract. *CitaraManis*, 328 Md. at 162. The owner asserted a defense of illegality, claiming that the construction manager "had violated the local building code by beginning work on the foundation and frame without a building permit." *Id.* We quoted the following passage from *Schloss* where we rejected that defense:

> There is no suggestion that any of the work did not meet all requirements, so far as public health or safety is concerned, or that the plans, when submitted, were not approved by the Buildings Engineer in all respects, before any of the interior work on the building was begun. The contract for supervision was not illegal *per se.* At most, it was conditioned upon the obtaining of a permit by the owner, based on the approval of the architectural drawings which the owner undertook to supply.
>
> It is the general rule that recovery will be denied if a contract is illegal in purpose or made by a person lacking the legal qualifications to contract. . . . But there is a recognized exception in cases where a denial of recovery would impose a penalty out of all proportion to the public good, particularly where the violation is not of a serious nature and merely incidental to the performance of the contract. . . . We think the violation here falls within the exception.

*Id.* at 162-63 (quoting *Schloss*, 213 Md. at 125) (cleaned up).

Thus, applying *Schloss* in *CitaraManis*, we concluded:

> The approval of dwellings under a rental housing licensing scheme, from a public safety and welfare standpoint, is more like the approval of plans for the construction of buildings than the licensing of service occupations.

9

> Inasmuch as the construction manager in *Schloss* was permitted affirmatively to recover promised compensation, *a fortiori,* the Hallowells, on the present record, are not obliged to refund rent paid. On remand in this case, the task of the plaintiffs will be to show the degree of violation of the underlying housing code. The absence of a rental housing license in and of itself does not establish the right to recover rent paid.

*Id.* at 163-64.

Notice what happened here. The claim before us in *CitaraManis* was the tenants' claim for restitution, not the landlords' claim for rent. Nevertheless, we backed our way into our conclusion on the tenants' unjust enrichment claim by first determining whether the exception to the general rule of denying recovery based on an illegal contract would have applied if the landlords had been suing for back rent. That was a logical approach because, under Maryland law, unjust enrichment claims are not available if the relationship is governed by an enforceable contract. *Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 95-96 (2000) (explaining that if the transaction is governed by a contract, the parties may not impose extra duties through an unjust enrichment claim).

Thus, once we determined that *Schloss* applied and the landlords were able to enforce their right to collect rent, the conclusion that the tenants could *not* recover their voluntary rent payments was inescapable. Put simply, the reason the tenants in *CitaraManis were not* entitled to restitution was precisely because the landlords *were* entitled to enforce their lease agreement under the exception described in *Schloss*. Our holding in *CitaraManis* was, therefore, an application of the settled principle that if there

10

is an enforceable contract, unjust enrichment claims cannot be used to modify the parties' contractual rights and obligations. *J. Roland Dashiell & Sons*, 358 Md. at 95-96.

The analysis in *CitaraManis* applies with equal force here. The only difference is that in *CitaraManis*, determining whether the landlords could have enforced the lease was a means to an end, that is, a means to getting to our answer on the tenants' unjust enrichment claim. But here, determining that the landlord may enforce the lease *is* the end. And because the facts here are indistinguishable from those in *CitaraManis*, the same result should obtain.[4]

**B**

In addition to our different understanding of *CitaraManis*, my reading of *McDaniel* differs from the Majority's reading. The Majority recited the facts of *McDaniel*, so there

---

[4] The Majority has two responses to this analysis. *First*, the Majority states that "*CitaraManis* involved a *tenant's right to obtain restitution* in the form of rent voluntarily paid, instead of the *unlicensed landlord's right to collect unpaid rent* during the unlicensed period, and that '[t]hese are different causes of action with distinct elements.'" Op. at 33, n.17. Respectfully, this merely restates the premise of my point, it doesn't respond to the point itself.

Second, the Majority states that

> although in *CitaraManis*, we declined to apply the common law rule expressed in the *Berenter* cases to the tenant's claim for disgorgement/restitution, as we discuss *infra*, 19 years later, in *McDaniel v. Baranowski*, 419 Md. 560 (2011), we did, in fact, rely on the common law principle articulated in the *Berenter* cases to prohibit an unlicensed landlord from utilizing the summary ejectment statute, RP § 8-401, to collect unpaid rent owed in connection with an unlicensed rental property.

*Id*. However, as explained above, this Court affirmatively held that the *Berenter* cases did *not* apply, it did not merely "decline to apply" those cases. Moreover, as explained below, the Majority is reading far too much into *McDaniel*.

11

is no need to exhaustively do the same here. The key facts are that the rental property had been licensed as required under the Anne Arundel County Code, but it expired years before the tenant entered the lease and took occupancy of the premises. *McDaniel v. Baranowski*, 419 Md. 560, 565 (2011). The tenant paid the first month's rent at the beginning of her occupancy, but she failed to pay the rent due in the second month, prompting the landlord to file a summary ejectment action under Maryland Code, Real Property ("RP") § 8-401 (1974, Repl. Vol. 2015), which resulted in a monetary judgment and judgment for possession. *McDaniel*, 419 Md. at 567. When the tenant failed to pay the third month's rent, the landlord again filed a summary ejection proceeding, which resulted in the same relief as in the first action. *Id.* at 568-72. The property wasn't licensed when the landlord filed both summary ejectment actions. *See id*. at 574.

We framed the issue in *McDaniel* as "whether a rental property owner in Anne Arundel County, who does not possess at the relevant times a license to operate the rental premises as mandated by the County Code, may nevertheless initiate summary ejectment proceedings, should a tenant fail to pay rent." *Id.* Like here, the owner in *McDaniel* was seeking to collect rent attributable to the period in which the property was not licensed. *See id.* at 565-68. The only material difference between *McDaniel* and the present case is that in the former, the property was still unlicensed when the owner filed the action, but here, the property's license had been restored by the time the owner took action to collect the rent. And under *McDaniel*, that difference is dispositive.

We held that "in order to invoke the facile process of summary ejectment, a landlord in those jurisdictions requiring licensure, must affirmatively plead and demonstrate that he

12

is licensed at the time of the filing of the complaint for summary ejectment in order to initiate the summary ejectment process." *Id*. at 587. Again, it warrants emphasizing that the landlord in *McDaniel* filed the actions with respect to unpaid rent that accrued while the property remained unlicensed. Thus, under *McDaniel*, an owner of an unlicensed property *is* entitled to enforce its rights in a summary ejectment proceeding—even with respect to rent payments that accrued while the property was unlicensed—so long as the property is licensed at the time the owner files the action. *See id.*

Notably, in *McDaniel*, although the tenant argued that the landlord should not be permitted to benefit from the streamlined summary ejectment process, we did *not* go so far as to hold—as the Majority does here—that the owner forfeited his right to unpaid rent from the unlicensed period. We certainly could have done that, but we instead adopted a more modest rule by requiring only that the property had to be licensed at the time the summary ejectment action was filed. *Id.* at 587. Moreover, in *McDaniel*, we applied our holding only to the landlord's effort to dispossess the tenant from the premises, not to the monetary judgments entered by the district court in the two actions the landlord had filed. *Id.* at 588 ("JUDGMENTS OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY IN DIST. CT. CASES 297200012177 AND 297200010105 AFFIRMED IN PART AND REVERSED IN PART: AFFIRMED AS TO BACK RENT AND

REVERSED AS TO THE LANDLORD'S POSSESSION OF THE PREMISES.") (bold deleted).[5]

Thus, I see *McDaniel* as standing for the proposition that judicial remedies, including the summary ejectment process, are available to recover unpaid rent accrued during the unlicensed period, provided that the property is licensed at the time the landlord seeks to enforce its right to rent under the lease. Under today's ruling, it appears that is no longer the case. *McDaniel* has, it seems, been effectively overruled.[6]

---

[5] The Majority takes issue with my characterization that it is effectively overruling *McDaniel*. Respectfully, I see no other viable characterization. In *McDaniel*, the Court held that so long as the property is licensed when the owner files the summary ejectment action, the owner can enforce its right to rent accrued during the unlicensed period. *Id.* at 587. Under today's ruling, that is no longer possible.

Further, the Majority does not contend that its broad reading of *McDaniel* is inconsistent with the mandate. But rather than acknowledge the flaw in its interpretation of *McDaniel*, it dismisses the significance of the mandate because "there was zero discussion whatsoever on that issue." Op. at 45, n.20. The Majority insists that it "will not interpret the language of the mandate as establishing an affirmative holding by this Court that a previously unlicensed landlord may subsequently acquire a license and initiate a summary ejectment proceeding to collect rent attributable to the period when the landlord lacked the license." *Id.* Respectfully, the Majority misses the point. Under Rule 8-606, "[a]ny disposition of an appeal . . . shall be evidenced by the mandate of the Court, which shall be certified by the Clerk under the seal of the Court and shall constitute the judgment of the Court." Thus, the mandate reflects the result intended by the Court. So the Majority has it backwards—if one's interpretation of an opinion is inconsistent with the mandate of the opinion, it means that something is wrong with the interpretation, not the other way around.

[6] Thus, I think the Majority is incorrect in stating that this Court in *McDaniel* applied Restatement § 181 or that our decision was based on "the public policy principle that courts will not permit an unlicensed contractor to enforce a contract, the performance of which is dependent upon a license issued for the protection of the public." Op. at 43. Our opinion in *McDaniel* did not mention Restatement § 181. Nor did it mention *Thorpe v. Carte*, 252 Md. 523 (1969), *Smirlock v. Potomac Development Corp.*, 235 Md. 195 (1964), or *Goldsmith v. Manufacturers' Liability Insurance Co. of New Jersey*, 132 Md. 283 (1918).

14

The Majority perceives the potential "negative consequences" if it did not hold as it did here. The Majority states:

> To limit the application of *McDaniel* only to the current collection efforts of an unlicensed landlord would create negative consequences for tenants living in unlicensed units. The landlord could delay his efforts to obtain licensure, thereby enabling unpaid rent to accumulate. When the license is ultimately obtained, the landlord could then sue for back-rent and possession based upon the tenant's failure to pay rent during the period when the landlord was required to be licensed. With the accumulation of unpaid rent during the unlicensed period, we can imagine circumstances where the landlord could obtain a considerable monetary judgment and an order for possession. There is a symmetry to our holdings—a tenant who voluntarily pays rent during an unlicensed period is not entitled to a punitive remedy of restitution or disgorgement of rent under the MCPA based upon a lack of licensure alone. On the other hand, a landlord may not engage in collection activities against a tenant to collect unpaid rent attributable to a period when the landlord was required to be licensed to engage in such activities.

Op. at 46, n.21.

I respectfully disagree with the Majority. *First*, the Majority seems to be implying that it is extending the application of *McDaniel*, but, as discussed above, it seems to be overruling it. It is not clear what the Majority means in its reference to "current collection

---

Although the Court did not have to mention those authorities to apply the principle for which they stand, it would be odd for the Court to apply the principle without mentioning the foundational cases on which the principle stands. Moreover, it is important to note that in *McDaniel*, we did not apply *Berenter*, but rather we analogized to it, as the Majority acknowledges. *McDaniel*, 419 Md. at 585 ("As a builder cannot seek swift justice through the institution of a mechanic's lien if he is unlicensed to operate his business, so should a landlord not be able to seek to **dispossess a tenant**, summarily, without having a license to operate the leased premises as required by local ordinance.") (emphasis added); Op. at 42 ("We analogized an unlicensed landlord's attempt to enforce his contract rights through the summary ejectment process to the unlicensed contractor in *Berenter* who was attempting to enforce his contractual right to payment through the mechanic's lien process."). Our holding in *McDaniel* was limited to the summary ejectment proceeding and should be properly understood as, at most, a narrow application of Restatement § 181 and the other occupational licensing cases.

15

efforts," but again, the landlord used the summary ejectment process to collect rent that accrued while the property was unlicensed, and under our holding in *McDaniel*, such actions were permitted so long as the property was licensed at the time of the filing.

*Second*, the notion that the landlord would delay efforts to get licensed to let unpaid rent accumulate is not consistent with rational business decision-making. Landlords are in the business of collecting rent. That's how they pay their mortgages and hope to profit from their investments. Owners have no incentive to let unpaid rent accumulate. We have no reason to believe that following *McDaniel*, landlords delayed getting their license to let the tenant's unpaid balance continue to rise.

*Third*, in any event, the only reason the unpaid rent would accumulate, under the facts presented in the certification order, is if the tenant would attempt to leverage the lack of a license into free rent, even though there is nothing wrong with that tenant's unit and the tenant received the full benefit of the bargain. If a tenant who received the benefit of the bargain wishes to avoid a large judgment, she can do so by paying the rent she agreed to pay, as and when it is due.

*Fourth*, I see nothing redeemable in the symmetry noted by the Majority. In the Majority's vision of symmetry, the decisive issue is whether the tenant withholds payment while the property is unlicensed, not where the risks and obligations are allocated to the parties under the lease agreement. This is the sort of symmetry this Court should endorse.

As the Majority notes, the relationship between a landlord and tenant is contractual. "Contracts play a critical role in allocating the risks and benefits of our economy, and courts generally should not disturb an unambiguous allocation of those risks in order to

16

avoid adverse consequences for one party." *Calomiris v. Woods*, 353 Md. 425, 445 (1999). Instead of a symmetry that rests on the tenant's sophistication, access to legal advice, or, let's face it, luck, this Court should favor a symmetry grounded in established principles of contract law.

Recall that under *CitaraManis*, the tenants' restitution claim failed precisely because the forfeiture rule of the unlicensed occupation cases did *not* apply to the landlords based solely on the lack of license. Conversely, in *Golt*, the tenant was entitled to restitution precisely because, due to the poor conditions of the property in addition to the lack of a license, the landlord was precluded from enforcing the lease. 308 Md. at 12-14. In other words, in both *CitaraManis* and *Golt*, the enforceability of the contract, not whether the tenant voluntarily paid the rent, determined whether the rent money belonged in the tenant's pocket or the landlord's pocket. If we hold, as I urge here, that the lack of a license alone does not preclude the landlord from enforcing the lease, then the symmetry achieved in *CitaraManis* and *Golt*—both grounded in contract law—would be preserved. Not so under the Majority's holding.

## C

The Majority's response to certified question 2 could lead to inconsistent, illogical, and counter-productive consequences. This Court has recently noted that "[a]t common law, a tenant's covenant to pay rent was independent of other covenants in the lease, absent an express agreement to the contrary." *Velicky v. Copycat Building LLC*, 476 Md. 435, 460 (2021). Thus, under common law, even if the property had a dangerous condition, the tenant still had to pay rent. *Id.* The General Assembly modified that common law rule by

enacting the rent escrow provisions of RP § 8-211. *Id.* We explained the workings of this statute at length in *Velicky*, so I won't do so here. Instead, there are several observations worth noting about the balance reached by the General Assembly between the tenant's common law duty to pay rent and the landlord's duty to keep the premises free of dangerous defects.

*First*, under the rent escrow statute, the tenant is not relieved of her duty to pay rent if the premises have dangerous conditions; the statute merely redirects the rental payments to the court as a means of securing the landlord's duty to repair the defects.

*Second*, the rent escrow provisions were not designed to punish the landlord or cause a forfeiture of its right to rent. Rather, the statute is the General Assembly's way of saying to landlords, "If you are not going to use your money to fix dangerous conditions on your rental properties, we will authorize the court to compel you to use your tenant's rental payments, which is, after all, *your* money, to see to it that the appropriate repairs are made."

*Third*, the presence of dangerous defects and the use of the rental payments to fix the same is not intended to put the property at risk of foreclosure, as the court is expressly permitted to apply rent paid into the court to mortgages and deeds of trust.[7]

---

[7] Interestingly, the statute expressly allows Baltimore City and any county to adopt ordinances "comparable" to the rent escrow statute and provides that such local laws shall "supersede the provisions" of RP § 8-211. RP § 8-211(o). In my view, the Baltimore City ordinance at issue here is not remotely comparable to the rent escrow provisions of RP § 8-211, as it embodies none of the features discussed above that the General Assembly included therein. Rather, the Baltimore City ordinance purports to impose draconian forfeiture provisions, which are disfavored under Maryland law. *See Com. Credit Corp. v. State*, 258 Md. 192, 199 (1970).

18

Today's holding has none of these attributes. In fact, it is not difficult to imagine realistic scenarios that would produce results inconsistent with the balance struck by the General Assembly. Take the example used by the Majority:

> Under Assanah-Carroll's theory, if a single unit in a 146-unit building failed an inspection, which in turn caused the entire building to fail to qualify for a new license, the consequence would be that the landlord would be forced to refund to all the tenants in the building, any rent that was voluntarily paid for the duration of the lapsed license period without demonstrating that they were damaged by the lack of licensure.

Op. at 31, n.16.

In the above scenario, under today's holding, the landlord would forfeit its right to collect rent from the tenants in all 146 units, even though the lack of a license was due to the failure of an inspection that affected only one of those units. Forfeitures are disfavored under Maryland law. *See Com. Credit Corp.*, 258 Md. at 199 ("[F]orfeitures are odious."); *Prince George's Cnty. v. Local Gov't Ins. Trust*, 388 Md. 162, 186-88 (2005) (contracts are construed to avoid disproportionate forfeiture). In contrast, under the rent escrow statute, all 146 tenants would have to continue to pay their rent. And, at most, only one of the tenants would have to pay the rent into the court, and only then if the defect creates a dangerous condition. Moreover, under the rent escrow statute, the landlord in this scenario would not be put at risk of losing its property.

Which brings me to my final point. "Article 13 of the Baltimore City Code is a comprehensive statutory scheme aimed at establishing minimum standards governing the condition, use, operation, occupancy, and maintenance of dwellings in order to make dwellings safe, sanitary, and fit for human habitation." *Aleti v. Metro. Balt., LLC*, 251 Md.

19

App. 482, 491 *aff'd,* 479 Md. 650 (2022) (cleaned up).  Put simply, the licensing requirements are one way in which the Baltimore City Council has endeavored to keep City residents from living in substandard housing.

Keeping in mind that the rule adopted today will apply to unlicensed properties that are substandard, there seems to be something incongruous about adopting a rule of law that would incentivize tenants to remain in substandard housing.  But, by allowing a tenant to live rent-free in such a property, today's holding will do just that.

Similarly, it seems counterproductive to adopt a rule that punishes an owner and deprives it of the funds needed to keep the building from falling into disrepair in the first place.  The draconian forfeiture rule adopted today, particularly as applied to multi-unit buildings, could have the unwelcome consequence of discouraging investment in the development of housing in Baltimore City and the rehabilitation of blighted areas.  The rule adopted today, therefore, does not seem to align with the policies that animate the licensing provisions of the Baltimore City Code.[8]

For the foregoing reasons, I respectfully dissent to the Majority's answer to certified question 2.  Judge Getty authorizes me to state that he joins in this dissent.

---

[8] I acknowledge that one could say that under the rule that I propose, landlords will have less incentive to comply with the licensing requirements.  In my view, landlords would still have plenty of incentives to comply, not the least of which is that the failure to comply will expose them to civil and criminal penalties including, in Baltimore City, "a misdemeanor and, on conviction, . . . a fine of not more than $1,000" for each day that a violation continues."  Balt. City Code, Art. 13, § 5-26(a)-(b) (2022).